*76 Justice Souter
delivered the opinion of the Court.
The question is whether a person who trades his drugs for a gun “uses” a firearm “during and in relation to . . . [a] drug trafficking crime” within the meaning of 18 U. S. C. § 924(c)(1)(A).[1] We hold that he does not.
I
A
Section 924(c)(1)(A) sets a mandatory minimum sentence, depending on the facts, for a defendant who, “during and in relation to any crime of violence or drug trafficking crime[,] ... uses or carries a firearm.”[2] The statute leaves the term “uses” undefined, though we have spoken to it twice before.
Smith v. United States, 508 U. S. 223 (1993), raised the converse of today’s question, and held that “a criminal who trades his firearm for drugs ‘uses’ it during and in relation to a drug trafficking offense within the meaning of § 924(c)(1).” Id., at 241. We rested primarily on the “ordinary or natural meaning” of the verb in context, id., at 228, and understood its common range as going beyond employment as a weapon: “it is both reasonable and normal to say that petitioner ‘used’ his MAC-10 in his drug trafficking offense by trading it for cocaine,” id., at 230.
Two years later, the issue in Bailey v. United States, 516 U. S. 137 (1995), was whether possessing a firearm kept near the scene of drug trafficking is “use” under § 924(c)(1). We looked again to “ordinary or natural” meaning, id., at 145, and decided that mere possession does not amount to “use”: “§ 924(c)(1) requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes *77 the firearm an operative factor in relation to the predicate offense,” id., at 143.[3]
B
This third case on the reach of § 924(c)(1)(A) began to take shape when petitioner, Michael A. Watson, told a Government informant that he wanted to acquire a gun. On the matter of price, the informant quoted no dollar figure but suggested that Watson could pay in narcotics. Next, Watson met with the informant and an undercover law enforcement agent posing as a firearms dealer, to whom he gave 24 doses of oxycodone hydrocholoride (commonly, OxyContin) for a .50-caliber semiautomatic pistol. When law enforcement officers arrested Watson, they found the pistol in his car, and a later search of his house turned up a cache of prescription medicines, guns, and ammunition. Watson said he got the pistol “to protect his other firearms and drugs.” App. C to Pet. for Cert. 11a.
A federal grand jury indicted him for distributing a Schedule II controlled substance and for “using” the pistol during and in relation to that crime, in violation of § 924(c)(1)(A).[4] Watson pleaded guilty across the board, reserving the right to challenge the factual basis for a § 924(c)(1)(A) conviction and the added consecutive sentence of 60 months for using the gun. The Court of Appeals affirmed, 191 Fed. Appx. 326 (CA5 2006) (per curiam), on Circuit precedent foreclosing any argument that Watson had not “used” a firearm, see id., at 327 (citing United States v. Ulloa, 94 F. 3d 949 (CA5 1996), and United States v. Zuniga, 18 F. 3d 1254 (CA5 1994)).
*78 We granted certiorari to resolve a conflict among the Circuits on whether a person “uses” a firearm within the meaning of 18 U. S. C. § 924(c)(1)(A) when he trades narcotics to obtain a gun.[5] 549 U. S. 1251 (2007). We now reverse.
II
A
The Government’s position that Watson “used” the pistol under § 924(c)(1)(A) by receiving it for narcotics lacks authority in either precedent or regular English. To begin with, neither Smith nor Bailey implicitly decides this case. While Smith held that firearms may be “used” in a barter transaction, even with no violent employment, see 508 U. S., at 241, the case addressed only the trader who swaps his gun for drugs, not the trading partner who ends up with the gun. Bailey, too, is unhelpful, with its rule that a gun must be made use of actively to satisfy § 924(c)(1)(A), as “an operative factor in relation to the predicate offense.” 516 U. S., at 148. The question here is whether it makes sense to say that Watson employed the gun at all; Bailey does not answer it.
*79 With no statutory definition or definitive clue, the meaning of the verb “uses” has to turn on the language as we normally speak it, see, e. g., Lopez v. Gonzales, 549 U. S. 47, 53 (2006); Asgrow Seed Co. v. Winterboer, 513 U. S. 179, 187 (1995); FDIC v. Meyer, 510 U. S. 471, 476 (1994); there is no other source of a reasonable inference about what Congress understood when writing or what its words will bring to the mind of a careful reader. So, in Smith we looked for “everyday meaning,” 508 U. S., at 228, revealed in phraseology that strikes the ear as “both reasonable and normal,” id., at 230. See also Bailey, supra, at 145. This appeal to the ordinary leaves the Government without much of a case.
The Government may say that a person “uses” a firearm simply by receiving it in a barter transaction, but no one else would. A boy who trades an apple to get a granola bar is sensibly said to use the apple, but one would never guess which way this commerce actually flowed from hearing that the boy used the granola. Cf. United States v. Stewart, 246 F. 3d 728, 731 (CADC 2001) (“[W]hen a person pays a cashier a dollar for a cup of coffee in the courthouse cafeteria, the customer has not used the coffee. He has only used the dollar bill”). So, when Watson handed over the drugs for the pistol, the informant or the agent[6] “used” the pistol to get the drugs, just as Smith held, but regular speech would not say that Watson himself used the pistol in the trade. “A seller does not ‘use’ a buyer’s consideration,” United States v. Westmoreland, 122 F. 3d 431, 436 (CA7 1997), and the Government’s contrary position recalls another case; Lopez, supra, at 56, rejected the Government’s interpretation of 18 U. S. C. § 924(c)(2) because “we do not normally speak or write the Government’s way.”[7]
*80 B
The Government would trump ordinary English with two arguments. First, it relies on Smith for the pertinence of a neighboring provision, 18 U. S. C. § 924(d)(1), which authorizes seizure and forfeiture of firearms “intended to be used in” certain criminal offenses listed in § 924(d)(3). Some of those offenses involve receipt of a firearm,[8] from which the Government infers that “use” under § 924(d) necessarily includes receipt of a gun even in a barter transaction. Smith is cited for the proposition that the term must be given the same meaning in both subsections, and the Government urges us to import “use” as “receipt in barter” into § 924(c)(1)(A).
We agree with the Government that § 924(d) calls for attention; the reference to intended use in a receipt crime carries some suggestion that receipt can be “use” (more of a hint, say, than speaking of intended “use” in a crime defined as exchange). But the suggestion is a tepid one and falls short of supporting what is really an attempt to draw a conclusion too specific from a premise too general.
The Smith majority rested principally on ordinary speech in reasoning that § 924(c)(1) extends beyond use as a weapon and includes use as an item of barter, see 508 U. S., at 228-230, and the Smith opinion looks to § 924(d) only for its light on that conclusion. It notes that the “intended to be used” clause of § 924(d)(1) refers to offenses where “the firearm is *81 not used as a weapon but instead as an item of barter or commerce,” id., at 234, with the implication that Congress intended “use” to reach commercial transactions, not just gun violence, in § 924(d) generally, see id., at 234-235. It was this breadth of treatment that led the Smith majority to say that, “[ujnless we are to hold that using a firearm has a different meaning in § 924(c)(1) than it does in § 924(d) — and clearly we should not — we must reject petitioner’s narrow interpretation.” Id., at 235 (citation omitted); see also Bailey, supra, at 146 (“[Ujsing a firearm should not have a different meaning in § 924(c)(1) than it does in § 924(d)” (internal quotation marks omitted)).
The Government overreads Smith. While the neighboring provision indicates that a firearm is “used” nonoffensively, and supports the conclusion that a gun can be “used” in barter, beyond that point its illumination fails. This is so because the utility of § 924(d)(1) is limited by its generality and its passive voice; it tells us a gun can be “used” in a receipt crime, but not whether both parties to a transfer use the gun, or only one, or which one. The nearby subsection (c)(1)(A), however, requires just such a specific identification.
It provides that a person who uses a gun in the circumstances described commits a crime, whose perpetrator must be clearly identifiable in advance.
The agnosticism on the part of § 924(d)(1) about who does the using is entirely consistent with common speech’s understanding that the first possessor is the one who “uses” the gun in the trade, and there is thus no cause to admonish us to adhere to the paradigm of a statute “as a symmetrical and coherent regulatory scheme, ... in which the operative words have a consistent meaning throughout,” .Gustafson v. Alloyd Co., 513 U. S. 561, 569 (1995), or to invoke the “standard principle of statutory construction . . . that identical words and phrases within the same statute should normally be given the same meaning,” Powerex Corp. v. Reliant Energy Services, Inc., 551 U. S. 224, 232 (2007). Subsections *82 (d)(1) and (c)(1)(A) as we read them are not at odds over the verb “use”; the point is merely that in the two subsections the common verb speaks to different issues in different voices and at different levels of specificity. The provisions do distinct jobs, but we do not make them guilty of employing the common verb inconsistently.[9]
C
The second effort to trump regular English is the claim that failing to treat receipt in trade as “use” would create unacceptable asymmetry with Smith. At bottom, this atextual policy critique says it would be strange to penalize one side of a gun-for-drugs exchange but not the other: “[t]he danger to society is created not only by the person who brings the firearm to the drug transaction, but also by the drug dealer who takes the weapon in exchange for his drugs during the transaction,” Brief for United States 23.
The position assumes that Smith must be respected, and we join the Government at least on this starting point. A difference of opinion within the Court (as in Smith) does not keep the door open for another try at statutory construction, where stare decisis has “special force [since] the legislative power is implicated, and Congress remains free to alter what we have done.” Patterson v. McLean Credit Union, 491 U. S. 164, 172-173 (1989). What is more, in 14 years Congress has taken no step to modify Smith’s holding, and this long congressional acquiescence “has enhanced even the *83 usual precedential force” we accord to our interpretations of statutes, Shepard v. United States, 544 U. S. 13, 23 (2005).
The problem, then, is not with the sturdiness of Smith but with the limited malleability of the language Smith construed, and policy-driven symmetry cannot turn “receipt-in-trade” into “use.” Whatever the tension between the prior result and the outcome here, law depends on respect for language and would be served better by statutory amendment (if Congress sees asymmetry) than by racking statutory language to cover a policy it fails to reach.
The argument is a peculiar one, in fact, given the Government’s take on the current state of § 924(c)(1)(A). It was amended after Bailey and now prohibits not only using a firearm during and in relation to a drug trafficking crime, but also possessing one “in furtherance of” such a crime. 18 U. S. C. § 924(c)(1)(A); see n. 3, supra. The Government is confident that “a drug dealer who takes a firearm in exchange for his drugs generally will be subject to prosecution” under this new possession prong. Brief for United States 27; see Tr. of Oral Arg. 41 (Watson’s case “could have been charged as possession”); cf. United States v. Cox, 324 F. 3d 77, 83, n. 2 (CA2 2003) (“For defendants charged under § 924(c) after [the post-Bailey] amendment, trading drugs for a gun will probably result in . . . possession [in furtherance of a drug trafficking crime]”). This view may or may not prevail, and we do not speak to it today, but it does leave the appeal to symmetry underwhelming in a contest with the English language, on the Government’s very terms.
Given ordinary meaning and the conventions of English, we hold that a person does not “use” a firearm under § 924(c)(1)(A) when he receives it in trade for drugs. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 Formerly 18 U. S. C. § 924(e)(1) (1994 ed.).

 Any violation of § 924(e)(1)(A), for example, demands a mandatory minimum sentence of five years. See 18 U. S. C. § 924(c)(l)(A)(i). If the firearm is brandished, the minimum goes up to 7 years, see § 924(c)(l)(A)(ii); if the firearm is discharged, the minimum jumps to 10 years, see § 924(c)(l)(A)(iii).

 In 1998, Congress responded to Bailey by amending § 924(c)(1). The amendment broadened the provision to cover a defendant who, “in furtherance of any [crime of violence or drug trafficking] crime, possesses a firearm.” 18 U. S. C. § 924(c)(1)(A). The amendment did not touch the “use” prong of § 924(c)(1).

 The grand jury also indicted Watson as a felon in possession of a firearm, in violation of § 922(g)(1). This count referred to the five firearms found in Watson’s house, but not the pistol he got for the narcotics.

 Compare United States v. Cotto, 456 F. 3d 25 (CA12006) (trading drugs for a firearm constitutes “use” of the firearm under § 924(c)(1)(A)); United States v. Sumler, 294 F. 3d 579 (CA3 2002) (same); United States v. Ramirez-Rangel, 103 F. 3d 1501 (CA91997) (same); United States v. Ulloa, 94 F. 3d 949 (CA5 1996) (same); United States v. Cannon, 88 F. 3d 1495 (CA8 1996) (same), with United States v. Montano, 398 F. 3d 1276 (CA11 2005) (per curiam) (defendant did not “use” a firearm within the meaning of § 924(c)(1)(A) when he traded drugs for a firearm); United States v. Stewart, 246 F. 3d 728 (CADC 2001) (same); United States v. Warwick, 167 F. 3d 965 (CA6 1999) (same); United States v. Westmoreland, 122 F. 3d 431 (CA7 1997) (same). The Fourth Circuit has held that a defendant “used” a firearm where he gave cocaine base to a compatriot in exchange for assistance in obtaining a gun. See United States v. Harris, 39 F. 3d 1262 (1994). Subsequent unpublished opinions in that Circuit have relied on Harris for the proposition that the receipt of a firearm in exchange for drugs constitutes use of the firearm. See, e. g, United States v. Belcher, No. 98-4845, 1999 WL 1080103 (Nov. 29,1999) (per curiam).

 The record does not say which.

 Dictionaries confirm the conclusion. “Use” is concededly “elastic,” Smith v. United States, 508 U. S. 223, 241 (1993) (Scalia, J., dissenting), but none of its standard definitions stretch far enough to reach Watson’s *80 conduct, see, e. g., Webster’s New International Dictionary of the English Language 2806 (2d ed. 1939) (“to employ”); The Random House Dictionary of the English Language 2097 (2d ed. 1987) (to “apply to one’s own purposes”; “put into service; make use of”); Black’s Law Dictionary 1541 (6th ed. 1990) (“B]o avail oneself of; . . . to utilize”); see also Smith, supra, at 228-229 (listing various dictionary definitions).

 See, e. g., 18 U. S. C. § 922(j) (prohibiting, inter alia, the receipt of a stolen firearm in interstate commerce); § 924(b) (prohibiting, inter alia, the receipt of a firearm in interstate commerce with the intent to commit a felony).

 For that matter, the Government’s argument that “use” must always have an identical meaning in §§ 924(c)(1)(A) and 924(d)(1) would upend Bailey v. United States, 516 U. S. 137 (1995). One of the relevant predicate offenses referred to by § 924(d)(1) is possession of “any stolen firearm ... [in] interstate or foreign commerce.” 18 U. S. C. §922(j). If we were to hold that all criminal conduct covered by the “intended to be used” clause in § 924(d)(1) is “use” for purposes of § 924(c)(1)(A), it would follow that mere possession is use. But that would squarely conflict with our considered and unanimous decision in Bailey that “‘use’ must connote more than mere possession of a firearm.” 516 U. S., at 143.