972 So.2d 931 (2007)
Paul Phillip SEVERANCE, Appellant,
v.
STATE of Florida, Appellee.
No. 4D07-338.
District Court of Appeal of Florida, Fourth District.
December 13, 2007.
*932 Carey Haughwout, Public Defender, and Paul E. Petillo, Assistant Public Defender, West Palm Beach, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Melanie Dale Surber, Assistant Attorney General, West Palm Beach, for appellee.

EN BANC
GUNTHER, J.
Appellant, Paul Phillip Severance, seeks review of his judgment and sentence for aggravated battery with a deadly weapon. He argues that the trial court fundamentally erred in instructing the jury on the aggravated battery charge because the instructions did not provide that the State was required to prove that Severance touched the victim with the deadly weapon in committing the battery. We find no merit in Severance's argument and affirm his conviction and sentence. We also recede from our decision in Munoz-Perez v. State, 942 So.2d 1025 (Fla. 4th DCA 2006).
The facts established at trial were that the victim was at her apartment one night watching television with her nine-year-old son when Severance, her boyfriend at the time, knocked on her door. The victim gave Severance permission to enter her apartment. When the victim asked Severance where he had been all day, Severance became very angry and hit the victim on the face with a closed fist. The victim told her son to go into the other room, and Severance continued to hit the victim. Severance then went into the kitchen to get a knife, and when he returned from the kitchen, he pushed the victim onto the couch and threatened to kill her. The victim testified that Severance put the knife to the victim's throat, and the victim tried to grab the knife to prevent Severance from cutting her with it. The victim further testified that throughout the whole time, Severance was choking her with one hand and hitting her with the other hand. The victim's son testified that he observed the entire incident and that Severance was "fixing to slit my mom's throat." The son also testified that when he tried to get Severance off of his mother, Severance pulled him back by his hair.
During the charge conference, the trial court granted the defense's request to include a special jury instruction on aggravated battery that "bare hands are not a deadly' weapon." Once that request was granted, defense counsel raised no further objections to the instruction on aggravated battery, and the trial court gave the following instruction:
To prove the crime of aggravated battery, the State must prove the following two elements beyond a reasonable doubt:

*933 The first is the definition of battery, and that is that, one, that Phillip [sic] Severance intentionally touched or struck [the victim] against her will.
And, two, that Paul Severance in committing the battery used a deadly weapon.
A weapon is a deadly weapon if it is used or threatened to be used in a way likely to causelikely to produce death or great bodily harm. Bare hands are not a deadly weapon.
The jury returned a verdict finding Severance guilty of aggravated battery with a deadly weapon on the victim as well as simple battery on the victim's son. On appeal, Severance challenges only his conviction for aggravated battery with a deadly weapon arguing that the jury instructions given do not make it clear that to "use a deadly weapon" under the aggravated battery statute, the State must prove beyond a reasonable doubt that the defendant actually touched the victim with the deadly weapon to commit the battery. Relying on Munoz-Perez, Severance contends that the instruction is misleading and constitutes fundamental, reversible error because the instruction improperly allowed the jury to convict him of aggravated battery if it found that he, while committing the battery, used a knife without touching the victim.
In Munoz-Perez, this Court concluded that the appellant's possession of the knife was insufficient to satisfy the requirement that he was using a deadly weapon while committing a battery. 942 So.2d at 1026. The testimony at trial was that the appellant grabbed the victim and held a sharp knife "near her throat" and also swung the knife in a threatening manner. Id. The appellant argued on appeal that because he never touched the victim with the knife, there was insufficient evidence to prove aggravated battery. Id. at 1027. This Court agreed, and reversed appellant's conviction for aggravated battery concluding that the trial court should have granted appellant's motion for judgment of acquittal on the aggravated battery charge. Id. at 1028. This Court stated:
The issue of whether there must be a touching with the deadly weapon in order to prove aggravated battery by Using a deadly weapon has not been decided by any of the cases cited by the appellant or the state.
. . . .
Our supreme court has noted that the legislature has made a distinction between carrying a deadly weapon and using a weapon in our statutes, in State v. Baker, 452 So.2d 927 (Fla.1984) and Owens v. State, 475 So.2d 1238 (Fla. 1985). We conclude, based on these cases, that the element "uses a deadly weapon" in the aggravated battery statute means using the weapon to commit the touching that constitutes the battery.
Id. at 1027-28.
However, we conclude that our interpretation in Munoz-Perez of the element "use a deadly weapon" under section 784.045(1)(a)(2), Florida Statutes (2005) is incorrect. Section 784.045(1)(a)(2) defines "aggravated battery" as follows:
(1)(a) A person commits aggravated battery who, in committing battery:
* * *
2. Uses a deadly weapon.
§ 784.045(1)(a)(2), Fla. Stat. (2005). The text of the statute does not require that in using a deadly weapon, the deadly weapon must actually touch the victim or be used in any particular manner. Rather, section 784.045(1)(a)(2) requires that in committing the battery, the defendant uses a deadly weapon. Because there is no limitation or requirement in the text of the statute as to the manner of use of a deadly *934 weapon, the plain meaning is that if a deadly weapon is used in any manner the battery is aggravated. The refusal of the Legislature to limit the manner or method of use of the deadly weapon does not make the statute ambiguous. On the contrary, it means instead that the drafters intended that it cover all uses.
The standard jury instruction on aggravated battery given in this case is fully consistent with the plain meaning of the statute. The standard jury instructions are presumed correct and are preferred over special instructions. Stephens v. State, 787 So.2d 747, 755-56 (Fla.2001). The defendant has the burden of demonstrating that the trial court abused its discretion in giving standard instructions. Id. The standard jury instruction on aggravated battery does not require that the deadly weapon used must touch the victim to commit the battery. Fla. Std. Jury Instr. (Crim.) 8.4.
Therefore, we conclude that the trial court adequately instructed the jury on the charge of aggravated battery with a deadly weapon in this case. We recede from Munoz-Perez v. State, 942 So.2d 1025 (Fla. 4th DCA 2006) and hold that the element "uses a deadly weapon" in the aggravated battery statute does not require using the weapon to commit the touching that constitutes the battery. Rather, the plain meaning of the aggravated battery statute is that in committing the battery, the defendant used a deadly weapon, which includes holding a deadly weapon without actually touching the victim with the weapon.
Severance's conviction and sentence for aggravated battery with a deadly weapon is affirmed.
Affirmed.
SHAHOOD, C.J., WARNER, POLEN, FARMER and GROSS, JJ., concur.
FARMER, J., concurs specially with opinion in which GUNTHER, WARNER and GROSS, JJ., concur.
STEVENSON, J., concurs in part, dissents in part with opinion.
MAY, J., concurs in part, dissents in part with opinion in which STONE and STEVENSON, JJ., concur.
KLEIN, J., dissents with opinion in which TAYLOR and HAZOURI, JJ., concur.
FARMER, J., concurring.
This responds to the opinions rejecting the analysis in the majority opinion. The essential assertion of all these opinions is that the meaning of the aggravated battery statute is unclear.
On the contrary, there is nothing ambiguous about section 784.045(1)(a)2.[1] The operative word here is uses, a standard word with expansive meaning.[2] In section 784.045, the term uses is not modified or limited. The statute does not suggest in any way that the deadly weapon must in fact contact the person. On the contrary, section 784.045 merely requires that it be employed in some way to facilitate the purpose of committing a battery. Because the statute does not specify how the person *935 necessarily uses the deadly weapon, the only possible meaning is that the deadly weapon be applied or employed in any way assisting the commission of a battery.
The United States Supreme Court has decided this identical issue in an opinion directly supporting the majority's decision. In Smith v. United States, 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), the Court confronted functionally identical text: "uses a firearm." The federal statute in question required that a firearm be used "in relation to" committing "any crime of violence or drug trafficking." The facts were that defendant had exchanged a firearm[3] a for illegal drugs. He argued that using the weapon as payment for the drugs did not fit the statute's narrow meaning of uses, and that the statute required that he fire or threaten to fire the weapon, or employ it for self-protection. Rejecting this argument, the Court explained;
"When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning. . . . `In the search for statutory meaning, we give nontechnical words and phrases their ordinary meaning.' Surely petitioner's treatment of his MAC-10 can be described as `use' within the everyday meaning of that term. Petitioner `used' his MAC-10 in an attempt to obtain drugs by offering to trade it for cocaine. WEBSTER'S defines `to use' as `[t]o convert to one's service' or `to employ.' BLACK'S LAW DICTIONARY contains a similar definition: `[t]o make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of.' Indeed, over 100 years ago we gave the word `use' the same gloss, indicating that it means `to employ' or `to derive service from.' Petitioner's handling of the MAC-10 in this case falls squarely within those definitions. By attempting to trade his MAC-10 for the drugs, he `used' or `employed' it as an item of barter to obtain cocaine; he `derived service' from it because it was going to bring him the very drugs he sought." [c.o.]
508 U.S. at 228-29, 113 S.Ct. 2050. In that case the accused had argued that the term uses should require proof that the firearm was used in the manner a firearm would most ordinarily be used, that the firearm must be fired. This argument is functionally indistinguishable from defendant's argument here that the deadly weapon must be used in the only way a battery may be done, that is to touch the victim. Again, Smith rejected the argument and pointed out:
"§ 924(c)(1)'s language sweeps broadly, punishing any `us[e]' of a firearm, so long as the use is `during and in relation to' a drug trafficking offense. See United States v. Long, 284 U.S.App. D.C. 405, 409-410, 905 F.2d 1572, 1576-1577 (Thomas, J.) (although not without limits, the word `use' is `expansive' and, extends even to situations where the gun is not actively employed), cert. denied, 498 U.S. 948 [111 S.Ct. 365, 112 L.Ed.2d 328] (1990). Had Congress intended the narrow construction petitioner urges, it could have so indicated. It did not, and we decline to introduce that additional requirement on our own.

". . . It is one thing to say that the ordinary meaning of `uses a firearm' includes using a firearm as a weapon, since that is the intended purpose of a *936 firearm and the example of `use' that most immediately comes to mind. But it is quite another to conclude that, as a result, the phrase also excludes any other use. Certainly that conclusion does not follow from the phrase `uses . . . a firearm' itself. As the dictionary definitions and experience make clear, one can use a firearm in a number of ways. That one example of `use' is the first to come to mind when the phrase `uses . . . a firearm' is uttered does not preclude us from recognizing that there are other `uses' that qualify as well." [e.s., c.o.]
508 U.S. at 229-30, 113 S.Ct. 2050. As in Smith, it is one thing to say in this case that the ordinary meaning of battery requires a touching, but it is quite another to conclude that, as a result, the element of committing the battery requires also, for the use of the deadly weapon, that the weapon actually touch or make contact with the victim. Obviously there are other ways in which a deadly weapon may be used.
Section 784.045(1)(a)2 requires that the deadly weapon be used in committing battery. In Smith the statute required the firearm to be used in relation to the crimes of violence or drug trafficking. Smith's defendant argued that in relation to was a limitation requiring a narrow meaning. Once again the Court disagreed with that argument, saying:
"The phrase `in relation to' is expansive Nonetheless, the phrase does illuminate § 924(c)(1)'s boundaries. According, to WEBSTER'S, `in relation to' means `with reference to' or `as regards.' The phrase `in relation to' thus, at a minimum, clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence. . . . Instead, the gun at least must "facilitat[e], or halve] the potential of facilitating," the drug trafficking offense." [e.s., c.o.]
508 U.S. at 237-38, 113 S.Ct. 2050. In this case, the phrase in committing a battery functions exactly like in relation to did in Smith. It means that the use of the deadly weapon "must have some purpose. or effect with respect to the crime" [battery]; it must "facilitate or have the potential of facilitating" the battery. Neither of these formulations necessarily requires that the deadly weapon actually touch the victim any more than in Smith it required that firearm be fired.
Also in Smith, as here, the defendant invoked the rule of lenity, arguing that because both exculpatory and inculpatory meanings are possible, the one favoring him must be applied. In rejecting that argument too the Court said:
"The mere possibility of articulating a narrower construction, however, does not by itself make the rule of lenity applicable. Instead, that venerable rule is reserved for cases where, `[a]fter `seiz[ing] every thing from which aid can be derived,' the Court is `left with an ambiguous statute. This is not such a case. Not only does petitioner's use of his MAC-10 fall squarely within the common usage and dictionary definitions of the terms `uses . . . a firearm,' but Congress affirmatively demonstrated that it meant to include transactions like petitioner's as `us[ing] a firearm' by so employing those terms in § 924(d).
"Imposing a more restrictive reading of the phrase `uses . . . a firearm' does violence not only to the structure and language of the statute, but to its purpose as well. When Congress enacted the current version of § 924(c)(1), it was no doubt aware that drugs and guns are a dangerous combination. In 1989, 56 percent of all murders in New York City were drug related; during the same period, the figure for the Nation's Capital was as high as 80 percent. The American *937 Enterprise 100 (Jan.-Feb. 1991). The fact that a gun is treated momentarily as an item of commerce does not render it inert or deprive it of destructive capacity. Rather, as experience demonstrates, it can be converted instantaneously from currency to cannon. We therefore see no reason why Congress would have intended courts and juries applying § 924(c)(1) to draw a fine metaphysical distinction between a gun's role in a drug offense as a weapon and its role as an item of barter; it creates a grave possibility of violence and death in either capacity.
"We have observed that the rule of lenity `cannot dictate an implausible interpretation of a statute, nor one at odds with the generally accepted contemporary meaning of a term.' That observation controls this case. Both a firearm's use as a weapon and its use as an item of barter fall within the plain language of § 924(c)(1), so long as the use occurs during and in, relation to a drug trafficking offense; both must constitute `uses' of a firearm for § 924(d)(1) to make any sense at all; and both create the very dangers and risks that Congress meant § 924(c)(1) to address." [e.s., c.o.]
508 U.S. at 239-41, 113 S.Ct. 2050. This entire line of reasoning is directly applicable to this case. Defendant's use of the deadly weapon falls squarely within common usage and the standard dictionary definitions. Employing only the narrow interpretation argued by the dissents does considerable damage to the text and purpose of the statute, whose purpose is to add severe punishment to any use of a deadly weapon that facilitates the commission of even a simple battery. Implausible results are avoided by giving effect to the requirement that the deadly weapon be used "in committing" the batteryi.e., that it facilitate the offense in some way. As the Court approved in Smith the knife in this case satisfied the requirement that it be used to "create[ ] a grave possibility of violence or death." 508 U.S. at 241, 113 S.Ct. 2050; see also Bailey v. United States, 516 U.S. 137, 148, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (holding that Smith made clear that the statutory term use requires the firearm to be actively employed in some way such as brandishing, displaying, bartering, striking with, and firing or attempting to fire it); but see Watson v. United States, 552 U.S. ___, 128 S.Ct. 579, 169 L.Ed.2d 472 (2007) (holding that "uses a firearm" does not include a person who trades his narcotics for a gun).
The statute requires as a foundational element that the accused be engaged in the act of committing a simple battery against the victim. The Legislature has added a new element to a simple battery that a deadly weapon also be used in some wayas a basis for increasing the punishment beyond what a mere simple battery by itself would bring. The analysis of those who reject the majority opinion conflates the simple battery's element of contact with the victim into a requirement that the deadly weapon be used to make the contact with the victim. There is not a single word in the text that even hints at such a meaning.
The Legislature is free to write a statute having one element of simple battery and an entirely separate element requiring any use of a deadly weapon in any manner to create a new crime different from simple battery alone. The Legislature is also free to name this new crime as a form of battery, even though the new crime has features different from traditional battery and even similar to other crimes. The difference between traditional battery and traditional assault, not to mention the similarity with the latter, is absolutely irrelevant *938 to the meaning of this new, uniquely constructed statute.
The Legislature is the sole architect of all criminal statutes. See Chicone v. State, 684 So.2d 736 (Fla.1996) (holding that legislature is vested with authority to define elements of statutory crime). The power to define the crime includes the power to dispense with elements included in other crimes. See Chicone 684 So.2d at 741 ("determining whether scienter is an essential element of a statutory crime is a question of legislative intent"). Subject only to the applicable constitutions, the Legislature alone decides the policies it intends to enforce by criminalization. It alone adds and omits the elements of those crimes. It alone decides the degree of punishment for each crime. The role of Judges is to interpret and apply those statutes as written, not to change the policies, rewrite the elements, or decide when punishment is too much. See Holly v. Auld, 450 So.2d 217 (Fla.1984) ("It has also been accurately stated that courts of this state are without power to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power.").
Section 784.045(1)(a)2 defines one particular crimewhich the Legislature chose to denominate as "aggravated battery"to mean a person "who in committing battery . . . uses a deadly weapon." It could just as well have called this new crime battery assisted by weapon. In punishing a simple battery far more seriously when a deadly weapon is used in some way to make it happeneven though the deadly weapon might not actually touch the victimthe Legislature has made a policy decision about using deadly weapons. This policy decision is not about traditional battery, whether simple or aggravated. The critical policy involved in this statute is to extract a much greater price in punishment when a deadly weapon is any part of the commission of simple battery. If that is the policyand I think it is demonstrably the only purpose of the statutewhy must the deadly weapon necessarily contact the victim?
One manner of use is to display a knife without contact to intimidate or coerce the victim while the perpetrator completes the simple battery. The fact that the Legislature did not instead employ terms like display or threaten in place of the broader term use does not logically either foreclose more limited meanings or raise any ambiguity about them. Whether a weapon was used in committing a battery is thus a question for a properly instructed jury. It is no more ambiguous than hundreds of other decisions juries are called to make in the criminal law.
Nevertheless, the opinions taking issue with the analysis of the majority opinion focus on the fact that the title of this particular crime uses the word battery and cite other statutes with different degrees of battery, all requiring contact. But it does not matter how other crimes have been defined. The only critical thing about section 784.045(1)(a)2 is how the Legislature built it. It could include or exclude elements of other crimes as the Legislature sees fit and appropriate. Chicone makes clear that the Legislature alone defines any new crime. The new crime may be built with or without the elements used in other crimes. Holly v. Auld holds that Judges may not make themselves into statutory architects under the guise of statutory construction. Judges may not add elements the Legislature has omitted, or delete elements the Legislature has included.
Again, the argument of the other opinions would add something not present in the words adopted and approved by the *939 Legislature and not reasonably inferable from those words. It would require us to "extend, modify, or limit, its [section 784.045] express terms or its reasonable and obvious implications." Holly v. Auld, 450 So.2d at 219. In so doing, we would be abrogating the legislative power to be the exclusive architect of any statute's purpose, elements and penalty.
GUNTHER, WARNER and GROSS, JJ., concur.
STEVENSON, J., concurring in part and dissenting in part.
I agree with the separate opinion filed by Judge May and dissent from part of the majority decision as she has indicated. As a practical matter, I believe that the "touching" requirement in Munoz-Perez v. State, 942 So.2d 1025 (Fla. 4th DCA 2006), could be fairly interpreted to include physical impact as well as physical contact. Nevertheless, a literal reading of the word "touching" would preclude a jury from finding that a defendant "used" a deadly weapon in committing a battery where the weapon physically impacted the victim, but did not actually come into contact with the victimas illustrated in Judge May's examples. In my view, the aggravated battery statute was clearly intended to reach such behavior. See § 784.045(1)(a)(2), Fla. Stat. ("A person commits aggravated battery who, in committing battery . . . [u]ses a deadly weapon.").
Based on the transcripts in this case and on Munoz-Perez, it appears there is considerable uncertainty among trial judges, prosecutors and defense attorneys about whether a deadly weapon must have some physical impact on the victim in order to prove aggravated battery. Consistent with the principle of lenity discussed by Judge Klein in his dissent, the aggravated battery using a deadly weapon statute must be interpreted as requiring at least some physical touching, or impact, on the victim attributable in whole or part to the presence of the deadly weapon. For this reason, the court in Munoz-Perez correctly held that the trial judge should have entered a judgment of acquittal on the aggravated aspect of the battery which occurred there. Simply stated, the deadly weapon must' be physically involved with the impact which constitutes the unwanted touching. The "touching" requirement set forth in Munoz-Perez was too restrictive to allow this concept; the majority's "anything goes" approach in the instant case provides no guidance at all. Consequently, I believe the statement in Munoz-Perez that the deadly weapon must be used "to commit the touching that constitutes the battery" should be receded from, and the issue clarified, as Judge May has attempted to do in her separate opinion. 942 So.2d at 1028.
MAY, J., concurring in part and dissenting in part.
I concur in the holding of the majority opinionthe trial court did not err in its instructions to the jury on the charge of aggravated battery. I further agree that the statute does not require a touching and we should recede from a sentence in Munoz-Perez v. State, 942 So.2d 1025 (Fla. 4th DCA 2006), in which we concluded that "the element `uses a deadly weapon' in the aggravated battery statute means using the weapon to commit the touching that constitutes the battery." Id. at 1028. That sentence was unnecessary to the decision in Munoz-Perez.
I disagree, however, with the majority's conclusion that if the weapon is used in. "any manner" the battery must necessarily be an aggravated battery. In my judgment, the weapon must be used in such a way as to assist in accomplishing the battery. See, e.g., Rodriguez v. State, 594 So.2d 318 (Fla. 3d DCA 1992) (where *940 pointing a pistol at the victim to "secure acquiescence" to the defendant's acts of non-consensual touching was deemed sufficient). For that reason, I do not believe that Munoz-Perez was wrongly decided and therefore dissent from that part of the majority's opinion that not only recedes from the overly-broad statement, but suggests error in the decision.
It is important to note the difference in the arguments presented in the present case and in Munoz-Perez. In this case, the defendant argues that the trial court erred in refusing to specially instruct the jury based upon the above-quoted sentence in Munoz-Perez. Specifically, the defendant suggests that the trial court should have instructed the jury that the State had the burden to "prove beyond a reasonable doubt that the defendant actually touched the victim with the deadly weapon to commit the battery."
Contrastingly, in Munoz-Perez, the defendant argued the evidence was insufficient to withstand a motion for judgment of acquittal. In that case, the battery had already occurred, but was continuing, when the defendant picked up a knife. The knife was neither "used" in the initial commission of the battery nor "used" to convert the simple battery into an aggravated battery with a deadly weapon. For that reason, I am still of the opinion that the trial court should have entered a judgment of acquittal on the aggravated aspect of the battery in Munoz-Perez.[4] We simply went too far in drawing a bright-line rule that aggravated battery with a deadly weapon necessarily always requires proof that the weapon actually touched the victim.
The scenarios in which the offense of aggravated battery occurs are varied and diverse. More often than not, there will be a touching with the deadly weapon or a projectile emanating from it. On some occasions, however, the battery will occur while the defendant is in possession of a deadly weapon even if the weapon itself does not touch the victim. If, for example, a defendant strikes the victim with a baseball bat wrapped in a velvet covering, any argument that there is no aggravated battery simply because the bat did not touch the victim would be specious. The same would hold true if a defendant struck the victim with the hand which held a deadly weapon and only the defendant's hand actually made contact with the victim. Or, for example, if a defendant charged at a victim holding a sledge hammer, but only knocked the victim down with his body, a jury could find the defendant guilty of aggravated battery.
Then, there are fact patterns such as that found in Munoz-Perez, in which the deadly weapon actually takes no part in the battery. I would suggest the issue is most often left for jury consideration after being properly instructed on the State's burden of proof. There are instances, however, like Munoz-Perez, Where the evidence simply does not meet the burden of proof to surpass a motion for judgment of acquittal. Thus, I concur in part and dissent in part.
STONE and STEVENSON, JJ., concur.
KLEIN, J., dissenting.
The battery at issue in this case is aggravated battery, which occurs when a person who, "in committing battery . . . uses a deadly weapon." § 784.045. In Munoz-Perez v. State, 942 So.2d 1025 (Fla. 4th DCA 2006), the case the majority is receding from, the panel concluded that the statute required that the victim be *941 touched by the deadly weapon. Although the word "uses" has been given a broad interpretation with respect to other crimes such as drug trafficking or robbery, battery is different in that it requires touching. And considering that touching is required, the statute read in its entirety convinces me to conclude that the legislature intended that, for aggravated battery, the weapon must touch the victim.
There are three different degrees of battery, and they all require contact. Under section 784.03(1)(a)1, a person who "intentionally touches or strikes another person against the will of the other" commits a battery which is a misdemeanor. If the striking causes "great bodily harm, permanent disability, or permanent disfigurement" the battery is a third degree felony. § 784.041. Aggravated battery, which occurs When a person who "in committing battery . . . uses a deadly weapon" is a second degree felony. § 784.045. Applying the broad interpretation of "uses" means that the mere touching of a victim by a person who is brandishing a weapon, but not using it to touch, is a second degree felony. Yet a defendant who is unarmed, but commits a battery causing great bodily harm, is only guilty of a third degree felony. Read in that context, I believe that the most serious crime intended by the Legislature in this case is aggravated assault, a third degree felony. § 784.021(1)(a), Fla. Stat. (2006). That was how the panel in Munoz-Perez reacted to this issue. See also Rodriguez v. State, 594 So.2d 318, 320 (Fla. 3d DCA 1992) (Gersten, J., dissenting in part).
If I were the only one who entertained this construction, I would end this dissent here, but this appears to be a close question. If this statute is susceptible of different interpretations, section 775.021, Florida Statutes, our lenity statute, requires us to apply the interpretation favorable to the defendant. I recognize that the fact that appellate judges may have different interpretations of a statute does not, in and of itself, render a statute ambiguous, Hayes v. State, 750 So.2d 1, 3 (Fla.1999), but we are not required to ignore it, either. And section 775.021 is founded on the due process requirement that criminal statutes must apprise ordinary persons of common intelligence as to what is prohibited, Perkins v. State, 576 So.2d 1310, 1312-13 (Fla.1991), not judges: I would hold, consistent with Munoz-Perez, and Judge Gersten's dissent in Rodriguez, that touching with the deadly weapon is required for aggravated battery.
TAYLOR and HAZOURI, JJ., concur.
NOTES
[1] § 784.045(1)(a)2, Fla. Stat. (2006) ("(1)(a) A person commits aggravated battery who, in committing battery . . . uses [e.s.] a deadly weapon.").
[2] See AMERICAN HERITAGE DICTIONARY (3d ed.) 1966 ("1. To put into service or apply to a purpose; employ. 2. To avail oneself of. . . . 4. To seek or achieve an end by means of; exploit"); BLACK'S LAW DICTIONARY (7th ed.) 1540 ("The application or employment of something"); MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY (CD EDITION) at use [2, verb] ("3: to carry out a purpose or action by means of: . . . apply to advantage . . . UTILIZE").
[3] Namely something called a "MAC-10" which the Court noted was "small and compact, lightweight, and can be equipped with a silencer. Most important of all, it can be devastating: a fully automatic MAC-10 can fire more than 1,000 rounds per minute." 508 U.S. at 225, 113 S.Ct. 2050.
[4] In Munoz-Perez, the State did not rely upon the standard jury instruction for aggravated battery to suggest that "use" of a deadly weapon was broader than "touching."