# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-41177

United States Court of Appeals
Fifth Circuit

**FILED**

February 4, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff−Appellee,

versus

JOSE CARDENAS,

Defendant−Appellant.

* * * * * * * * * * * * * *

No. 13-41191

UNITED STATES OF AMERICA,

Plaintiff−Appellee,

versus

PEDRO CARRILLO-TORRES,

Defendant−Appellant.

Appeals from the United States District Court
for the Southern District of Texas
No. 7:13-CR-164-1
No. 7:13-CR-164-2

No. 13-41177
No. 13-41191

Before HIGGINBOTHAM, SMITH, and GRAVES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:*

Jose Cardenas and Pedro Carrillo-Torres pleaded guilty of conspiring to commit fraud with counterfeit access devices and were sentenced to 108 months' imprisonment. Each asserts an error in calculating the term of imprisonment recommended by the United States Sentencing Guidelines (the "Guidelines"). Cardenas challenges an eighteen-level upward adjustment for expected losses between $2.5 million and $7 million; Carrillo-Torres contests a six-level upward adjustment for an offense involving more than 250 victims. Because the district court correctly determined the intended loss, we affirm Cardenas's sentence. Because the court erred in interpreting the provision for calculating the number of victims and the government has not demonstrated that the error was harmless, we vacate Carrillo-Torres's sentence and remand for resentencing.

I.

Inter-National Bank ("INB") contacted the McAllen Police Department about a series of suspicious transactions at ATMs. INB gave the police a card that one ATM had placed into its rejection slot: a plain white card with a personal identification number ("PIN") written on it, a common tool for ATM fraud. INB eventually provided police with a record of more than $250,000 in suspicious withdrawals. The police obtained an ATM surveillance video showing the scheme in action. Carrillo-Torres and a confederate would drive up to

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2

No. 13-41177
No. 13-41191

an ATM multiple times to withdraw cash using white plastic cards.

The police were notified that a suspect, Carrillo-Torres, had been detained at an INB branch; they transferred him to the police station, where he waived his *Miranda* rights and gave a statement. His car contained a room key from a local motel, cash, deposit slips, and white plastic cards.

The police went to the motel, where the front-desk employee identified the room to which the key belonged and gave them a copy of the tenant's identification; it was the ID card for the passenger in Carrillo-Torres's vehicle. When the police went to the room, Cardenas answered the door. They saw, in plain view, bags of currency and materials used to counterfeit ATM cards. The police detained Cardenas, who was advised of his rights and made a statement admitting to participation in the scheme.

The police ultimately recovered evidence of $458,276.34 in actual losses, which was determined by adding together the cash found in the vehicle and hotel room and deposit slips, wire receipts, and gift cards. Additionally, they found a flash drive in the hotel that contained 7,197 legitimate bank-account numbers that had not yet been accessed as part of the scheme.

II.

Cardenas and Carrillo-Torres were charged with aiding and abetting the possession of thirty counterfeit access devices in violation of 18 U.S.C. § 1029(a)(3). Both pleaded guilty in exchange for the government's agreement to recommend a two-level reduction for acceptance of responsibility.[1]

Each was assigned a base offense level of six. U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(a)(2) (2012) ("U.S.S.G."). The court assessed two

---

[1] The government ultimately recommended a three-level reduction for acceptance of responsibility, which the district court granted.

3

No. 13-41177
No. 13-41191

upward adjustments that are at issue in this appeal.[2]

The presentence report ("PSR") recommended an eighteen-level upward adjustment based on an intended loss between $2.5 million and $7 million, U.S.S.G. § 2B1.1(b)(1)(J), reaching that figure by adding together the documented losses from the scheme and $500 for each of the 7,197 unused account numbers on the flash drive, U.S.S.G. § 2B1.1 cmt. n.3(F)(i). The court accepted the sum of $4,056,776.34 for intended losses and applied the adjustment.

Second, the PSR recommended a six-level upward adjustment for offense conduct involving more than 250 victims, U.S.S.G. § 2B1.1(b)(2)(C), counting as victims the holders of the 7,197 account numbers found on the flash drive. The court applied the adjustment, concluding that the defendants had "used" the account numbers as required for the account-holders to be victims. U.S.S.G. § 2B1.1 cmt. n.4(E).

Each defendant had an offense level of 31 and a criminal history category of I, yielding a guideline range of 108–135 months, with a statutory maximum of 120 months. The court imposed 108 months with this explanation:

> In doing so, . . . I've considered closely the Guidelines here and the Court believes that its rulings are correct on the Guidelines. But even if the Court isn't correct, the Court believes it is necessary to sentence at this very high range even as far as the statutory maximum here because of all of those things that I have touched on.

Cardenas challenges the application of the $500 minimum intended loss to the unused numbers on the flash drive. Carrillo-Torres questions the inclusion, as victims, of those persons whose accounts were not accessed. We review *de* novo these questions about the interpretation and application of the

---

[2] Uncontested on appeal are the upward adjustments for using "sophisticated means," U.S.S.G. § 2B1.1(b)(10)(C) & comment. (n.8), and for possessing and using device-making equipment, *id.* § 2B1.1(b)(1), (11).

Guidelines. *United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007).

### III.

The Guidelines instruct the district court to calculate loss as "the greater of actual loss or intended loss." § 2B1.1 cmt. n.3(A).   The court found that the intended loss was just over $4 million, reached by adding together the realized losses and $500 for each account number found on the flash drive.   In counterfeit-access-device cases, "loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500."   U.S.S.G. § 2B1.1 cmt. n.3(F)(i).   The court took this to mean that its intended-loss calculation should include $500 for every access device, of which there were over 7,000 on the flash drive.

Cardenas challenges that $500-per-account number, maintaining that the relevant commentary requires that the defendant actually used the device:

> Stolen or Counterfeit Credit Cards and Access Devices; Purloined Numbers and Codes.—In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device.

U.S.S.G. § 2B1.1 cmt. n.3(F)(i).

Cardenas's argument fails because nothing in the text requires the access devices to be actually *used*.  The commentary ascribes two characteristics to "loss":  It includes any unauthorized charges made with the device, and it "shall be not less than $500 per access device."  The commentary does not require unauthorized charges just because that phrase appears first. Instead, the case can involve "any counterfeit access device or unauthorized access device."  The express language of the provision makes plain there is no requirement that the access device was used.

The next sentence in the same commentary provides further support

No. 13-41177
No. 13-41191

that the $500 minimum sweeps in both the used and the merely possessed. It distinguishes between use and mere possession in setting the minimum for an unauthorized access device that is a particular means of telecommunications access:

> However, if the unauthorized access device is a means of telecommunications access that identifies a specific telecommunications instrument or telecommunications account . . . and that means was only possessed, and not used, during the commission of the offense, loss shall be not less than $100 per unused means.

U.S.S.G. § 2B1.1 cmt. n.3(F)(i).

This language makes two things plain. First, the authors of the Guidelines knew how to limit the application of these provisions to the use of access devices. And second, the general $500 provision applies to devices used and unused, because this commentary provision treats an unused means of telecommunications access as already within the category of devices to which this section applies. If "a case involving any counterfeit access device or unauthorized access device" included only situations involving devices used to make unauthorized charges, the provision would not include further explanation for a case in which "the unauthorized access device" was an unused means of telecommunications access; such a device would be outside the ambit of the provision.

The other circuits that have faced this question have reached the same conclusion.[3] Cardenas's focus on the meaning of "use" is misplaced; the $500 minimum applies even to unused devices.

Cardenas asks us to review the sufficiency of the evidence to support this

---

[3] *See United States v. Gilmore*, 431 F. App'x 428, 430−31 (6th Cir. 2011); *United States v. Camper*, 337 F. App'x 631, 632–33 (9th Cir. 2009) (mem.); *United States v. Mendez*, Nos. 14-4059, 14-4093, 14-4094, 2014 WL 5786649, at *2 (4th Cir. Nov. 7, 2014) (per curiam) (unpublished).

6

No. 13-41177
No. 13-41191

adjustment, but his brief is devoted entirely to the question of interpreting this provision. Because the district court correctly interpreted the Guidelines, and Cardenas has provided no legal or factual basis for concluding that there was insufficient evidence to apply this intended-loss adjustment, there is no error in his sentence.

## IV.

The district court assessed a six-level increase because it found that Carrillo-Torres's offense involved more than 250 victims. In crimes involving "means of identification," the term "victim" includes "any individual whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1 cmt. n.4(E). The court concluded that the persons whose 7,197 account numbers were on the flash drive counted as victims.[4]

In response to an objection regarding whether these means had been used, the court noted that the defendants "had 7,000-something access devices . . . without authority," "these access devices were obtained without authority," and the defendants had "transferred them over to the flash drive." The sentence therefore appears to be based on the defendants' unlawfully obtaining and possessing these access devices and transferring them to the flash drive on which the numbers were found. Carrillo-Torres asserts that for that adjustment to apply, the Guidelines require more than acquisition or possession. The government disputes this interpretation and also claims that any error was harmless.

---

[4] The inclusion of account numbers as means of identification is not in dispute.

No. 13-41177
No. 13-41191

A.

There is no binding Fifth Circuit precedent interpreting this relatively new provision of the Guidelines. Ordinary methods of textual interpretation[5] and the conclusions of our sister circuits convince us that the acquisition and possession of a means of identification do not qualify as using that means of identification.

The Guidelines do not define what is encompassed by "use." We normally construe a word "not defined by statute . . . in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993) (citation omitted). "Use" is generally understood to require more than acquisition or possession. For example, in *Bailey v. United States*, 516 U.S. 137, 144–46 (1995), the Court recognized that "use" in a statute includes "active employment" or "to carry out a purpose or action by means of" but does not encompass mere possession. Even possession with the intent to use, or taking steps that would allow use later, is not active employment. *See id.* at 147.[6] Although *Bailey* interpreted "use" as it appeared in a particular statutory scheme and did not define the word for all statutes, *see United States v. Castillo*, 77 F.3d 1480, 1499 n.34 (5th Cir. 1996), its explanation of the common meaning is persuasive.

In addition to its common meaning, the usage of the word in other parts of the Guidelines lends support to the narrower definition. We are informed in this analysis by two interpretive propositions. First, "[a] term appearing in

---

[5] "It is well established that our interpretation of the Sentencing Guidelines is subject to the ordinary rules of statutory construction." *United States v. Carbajal*, 290 F.3d 277, 283 (5th Cir. 2002) (citation omitted).

[6] For this reason, transferring the data to a flash drive did not count as using the means of identification. Transferring the account numbers to a different storage medium did not actively employ them for the criminal purpose.

No. 13-41177
No. 13-41191

several places in a statutory text is generally read the same way each time it appears." *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) (citation omitted). And second, "we construe statutes, where possible, so as to avoid rendering superfluous any parts thereof." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) (citation omitted).

Other guideline provisions distinguish between possession and use, indicating that the two terms have distinct meanings in that scheme.[7] Reading "use" to include mere possession for this provision would require either a different definition without a strong contextual justification or reading those other uses to include surplus terms. For example, interpreting "use" to include possession would be incompatible with other provisions that invoke, as significant, the difference between use and possession, such as § 2B2.1's commentary background, which references "[w]eapon possession, but not use." And it would render some language surplusage, such as § 2K1.5(c)(1)'s reference to a defendant who "used or possessed [a] weapon or material." The Guidelines plainly treat mere possession as insufficient to constitute use.

"Use" likewise requires more than merely obtaining the means of identification. A person who obtains an item for later use in a crime is not yet actively employing it for the criminal goal; obtaining an item is usually antecedent to using it. The Supreme Court has recognized this distinction.

---

[7] *See, e.g.*, U.S.S.G. §§ 2A2.3(a)(1) (setting base offense level for assault at 7 "if a dangerous weapon . . . was possessed and its use was threatened"); 2B1.1(b)(11) (two-level increase for "the possession or use of any (i) device-making equipment, or (ii) authentication feature"); 2B1.6 cmt. n.2 (specifying that a sentence imposed for aggravated identify theft should not have specific offense characteristics applied "for the transfer, possession, or use of a means of identification"); 2B2.1 cmt. background ("Weapon possession, but not use, is a specific offense characteristic because use of a weapon (including to threaten) ordinarily would make the offense robbery."); 2K1.3(b)(3) (four-level increase if defendant "used or possessed any explosive material in connection with another felony offense"); 2K1.5(c)(1) ("If the defendant used or possessed the weapon or material in committing or attempting another offense, apply the guideline for such other offense . . . .").

No. 13-41177
No. 13-41191

For example, in *Watson v. United States*, 552 U.S. 74 (2007), the Court held that a defendant had not "used" a gun in relation to a drug crime where he had traded drugs to an informant in exchange for the gun. The common meaning of "use" does not encompass receiving something in a transaction; "[a] seller does not 'use' a buyer's consideration." *Id.* at 79 (citation omitted).

Additionally, as with possession, the Guidelines distinguish between obtaining a thing and using it.[8] It is not by happenstance that the Guidelines distinguish among use, possession, and other actions in these adjustments; the criminal provisions covering unauthorized access devices (under which Carrillo-Torres was convicted) and identity theft (which provisions govern the criminal use of means of identification) likewise draw these distinctions. *See* 18 U.S.C. §§ 1029 (access devices), 1028A (aggravated identity theft).

Requiring some active employment of the means of identification is consistent with the approaches taken by other courts of appeals. The Seventh, Eighth, and Eleventh Circuits have concluded that "use" in this application note requires more than possession or acquisition,[9] and no circuit has held to the contrary. This interpretation also matches our approach in *United States v. Onenese*, 542 F. App'x 427, 429–30 (5th Cir. 2013) (per curiam).

For the 7,197 account numbers on the flash drive, there was no evidence that the defendants actively employed those numbers. The evidence shows only that they obtained and possessed them with the intent to use them for fraudulent ends. The use requirement in this guideline requires more than

---

[8] U.S.S.G. §§ 2L2.1(b)(5) (four-level increase if "the defendant fraudulently obtained or used . . . a United States passport"); 3B1.3 cmt. n.2(B) ("A defendant who exceeds or abuses the authority of his or her position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification.").

[9] *United States v. Rabiu*, 721 F.3d 467, 473–74 (7th Cir. 2013); *United States v. Adejumo*, 772 F.3d 513, 527–28 (8th Cir. 2014); *United States v. Hall*, 704 F.3d 1317, 1321–23 (11th Cir. 2013).

No. 13-41177
No. 13-41191

acquisition and possession, and the district court erred by interpreting the Guidelines to the contrary.

B.

The government contends that the error was harmless. To show that, the government first "must convincingly demonstrate that the district court would have imposed" the same sentence for "the same reasons it gave" in the earlier sentencing. *United States v. Ibarra-Luna*, 628 F.3d 712, 718–19 (5th Cir. 2010). Second, it must show that the sentence imposed "was not influenced in any way by the erroneous Guidelines calculation." *Id.* at 719. This is a "heavy burden" that will not be satisfied merely by showing that "the same explanation the court gave for imposing a sentence outside the miscalculated range *could* also support a sentence outside the correctly calculated range." *Id.* at 717. Because this sentence is derived from the erroneously identified guideline range, the government fails to satisfy the second requirement.

The district court diligently considered the sentencing factors in 18 U.S.C. § 3553(a) and, as noted above, it stated that "even if the Court isn't correct, the Court believes it is necessary to sentence at this very high range." But there is no explanation for the sentence (108 months) at the low extreme of the improper range that is not dependent on the erroneous designation of that range; we cannot accept that it was a coincidence. It is not enough that the statutory maximum is 120 months and the district court stated that it felt the need to sentence near the statutory maximum; the relevant unit of analysis is the exact sentence imposed. *Ibarra-Luna*, 628 F.3d at 719. A sentencing error is not harmless if the sentence was derived from the erroneous range or

No. 13-41177
No. 13-41191

is explainable only by reference to the error.[10]

Cardenas's sentence is AFFIRMED.    Carrillo-Torres's sentence is VACATED and REMANDED for resentencing.

---

[10] *See Ibarra-Luna*, 628 F.3d at 718; *United States v. Vasquez-Tovar*, 420 F. App'x 383, 384 (5th Cir. 2011) (per curiam); *United States v. Villarreal*, 577 F. App'x 299, 301 (5th Cir. 2014) (per curiam).