# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 23, 2010

No. 08-10630

Lyle W. Cayce
Clerk

RICHARD FRAME; WENDELL DECKER; SCOTT UPDIKE; J N, a minor, by his next friend and mother Gabriela Castro; MARK HAMMAN; JOEY SALAS

Plaintiffs - Appellants

v.

CITY OF ARLINGTON, A Municipal Corporation

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before JOLLY, PRADO, and SOUTHWICK, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The petition for rehearing is GRANTED. We withdraw our prior opinion, *Frame v. City of Arlington*, 575 F.3d 432 (5th Cir. 2009), and substitute the following, which reflects substantial changes from the earlier opinion.[1]

---

[1] This footnote gives the reader a glimpse of the differences between this opinion on rehearing and our first opinion. The district court initially dismissed the plaintiffs' complaint on statute of limitations grounds. On appeal, we vacated in part and remanded. We agreed that the plaintiffs' claims accrued upon completion or alteration of the noncompliant sidewalk, curb, or parking lot, but found that the City had the burden to prove expiration of the two-year limitations period. In so deciding, we accepted the plaintiffs' argument that violations of the regulations were actionable because sidewalks, curbs, and parking lots were "services" provided by the City. Judge Prado dissented, arguing that the statute of limitations was triggered by the plaintiffs' encounters with, not the City's completion of, noncompliant sidewalks, curbs, or parking lots. On petition for rehearing, the City argues we erred in

No. 08-10630

OPINION ON REHEARING

The plaintiffs are persons with disabilities who depend on motorized wheelchairs for mobility. They allege that the City of Arlington, by failing to make the City's curbs, sidewalks, and certain parking lots ADA-compliant, has violated the Americans with Disabilities Act (ADA) and the Rehabilitation Act. The district court dismissed their complaint on the basis that their claims were barred by the applicable two-year statute of limitations. This appeal raises more than one issue of first impression—at least for this court. Initially, we must decide whether Title II of the ADA authorizes the plaintiffs' claims. To the extent we find Title II authorizes the plaintiffs' claims, we must also consider whether those claims are subject to a statute of limitations and, if so, when the claims accrued.

We hold that Title II mandates the modification of physical infrastructures that "effectively deny" access to a public entity's services, programs, or activities. Within this framework, sidewalks, curbs, and parking lots are "facilities," not "services, programs, or activities." Consequently, plaintiffs only have a private right of action to enforce compliance with the implementing regulations to the extent that the failure to make a sidewalk, curb, or parking lot compliant denies plaintiffs access to actual services, programs, or activities. Where the plaintiffs establish a private cause of action, we further hold that the plaintiffs' claims are

---

concluding that sidewalks, curbs, and parking lots constitute "services" within the meaning of Title II. The plaintiffs argue that we erred in concluding that the statute of limitations is triggered by completion of a noncompliant sidewalk, curb, or parking lot. The plaintiffs contend that the statute of limitations is triggered by a handicapped person's most recent encounter with that sidewalk, curb, or parking lot. On rehearing, we hold that sidewalks, curbs, and parking lots are *not* Title II services, programs, or activities; thus, the plaintiffs lack a private right of action to enforce the regulations unless noncompliance has denied access to a service, program, or activity. Where a cause of action is established, the statute of limitations is triggered when the plaintiff knew or should have known that he or she was excluded from a city service, program, or activity.

No. 08-10630

subject to a two-year statute of limitations, and that the claims accrued when the plaintiffs were excluded from the desired program, service, or activity. We further conclude, however, that it was the City's burden to prove accrual and expiration of any limitations period. Because the district court erred in requiring the plaintiffs to prove that their claims had not expired, we remand for further proceedings.

I.

This appeal comes to us from the grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). We therefore accept the factual allegations of the plaintiffs' complaint as true. *See, e.g., Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). The plaintiffs filed their complaint in the district court on July 22, 2005, and amended it three times. Accordingly, for facts we refer to the plaintiffs' final amended complaint.

The plaintiffs are individuals who reside in Arlington who have mobility impairments that require that they use motorized wheelchairs. They point to more than one hundred curbs and poorly maintained sidewalks in Arlington that they allege make their travel impossible or unsafe. They also point to at least three public facilities lacking adequate handicap parking. Count 1 of the plaintiffs' complaint alleges violations of Title II of the ADA. *See* Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.* (prohibiting public entities from discriminating on the basis of disability).[2] Count 2 of the plaintiffs' complaint alleges violations

---

[2] Count 1 also alleges that the City has violated 28 C.F.R. § 35.150 by failing to implement a plan to transition its curbs, sidewalks, and parking lots to ADA compliance. 28 C.F.R. § 35.150 is a regulation promulgated by the Attorney General that requires public entities to develop transition plans to achieve compliance with Title II. *See* ADA Accessibility Guidelines, 28 C.F.R. § 35.150(d)(1) (requiring public entities to draft transition plans). Citing *Alexander v. Sandoval*, 532 U.S. 275 (2001), the district court dismissed the plaintiffs' claims under 28 C.F.R. § 35.150 because it concluded the plaintiffs had no private cause of action to enforce that regulation. *See* 532 U.S. at 291 (implementing regulation, on its own, cannot create private right of action); *see also Iverson v. City of Sandusky*, 452 F.3d 94, 99-100 (1st Cir. 2006) (no private right of action to enforce 28 C.F.R. § 35.150); *Ability Ctr. of Greater*

3

No. 08-10630

of Section 504 of the Rehabilitation Act, which prohibits recipients of federal funding from discriminating against persons on the basis of disability. *See* Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The plaintiffs do not seek monetary damages; they only ask for an injunction requiring the City to bring its curbs, sidewalks, and parking lots into ADA compliance.

The City of Arlington moved to dismiss the complaint, and the district court granted the City's motion on the ground that the plaintiffs' claims were barred by the applicable two-year statute of limitations. The district court held that the plaintiffs' claims accrued, and the two-year limitations period began to run, on the date the City completed the construction or alteration of any noncompliant curb, sidewalk, or parking lot. Because the plaintiffs' complaint did not point to dates of noncompliant construction or alteration within the two years preceding its filing date, July 22, 2005, the district court dismissed the plaintiffs' claims.

On appeal, the plaintiffs argue that their claims accrued on the date individual plaintiffs actually encountered a noncompliant barrier—not on the date the City completed a noncompliant construction or alteration. In the alternative, the plaintiffs argue that statutes of limitation do not apply to claims for injunctive relief; that the noncompliant curbs, sidewalks, and parking lots are continuing violations of the ADA that relieve them of the limitations bar; and that dismissal was improper because the City, and not the plaintiffs, had the burden to establish when the plaintiffs' claims accrued and the limitations period expired.

We consider each of the plaintiffs' arguments separately.

II.

---

*Toledo v. City of Sandusky*, 385 F.3d 901, 913-15 (6th Cir. 2004) (same). The plaintiffs do not appeal that ruling.

No. 08-10630

We review a Rule 12(b)(6) dismissal *de novo*. *See, e.g., Lindquist v. City of Pasadena, Tex.*, 525 F.3d 383, 386 (5th Cir. 2007). "The complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff." *Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005) (citing *Sloan v. Sharp*, 157 F.3d 980, 982 (5th Cir. 1998)). The interpretation of a statute is a question of law we also review *de novo*. *See, e.g., Motient Corp. v. Dondero*, 529 F.3d 532, 535 (5th Cir. 2008).

## A.

The immediate question is whether the plaintiffs have stated a cognizable claim under Title II of the ADA; that is, whether the plaintiffs have a private right of action, in connection with their statutory right of access, to force a city to maintain its curbs, sidewalks, and parking lots in compliance with the implementing regulations. If they have no claim, then we need not reach the statute of limitations issues. For reasons we explain, we decide that, to the extent noncompliant sidewalks, curbs, or parking lots effectively deny plaintiffs access to a city "service, program, or activity," plaintiffs have a private right of action to enforce the regulations; to the extent the noncompliant sidewalks, curbs, or parking lots do not effectively deny plaintiffs access to a "service, program, or activity," plaintiffs do not have a private right of action to enforce the regulations.[3]

The ADA was passed "[t]o provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II applies to public entities. It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

---

[3] In some cases, whether a burden effectively denies access can be determined by an objective standard; in other cases, it will be a question of mixed law and fact, or even pure fact.

discrimination by any such entity." 42 U.S.C. § 12132.[4]  We have held that to make a prima facie case under Title II a plaintiff must show: (1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability. *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004).  There is no dispute that the City is a public entity, or that the plaintiffs here have qualifying disabilities.[5]

Plaintiffs have assembled a range of arguments as to how Arlington's newly constructed, newly maintained, and pre-ADA[6] sidewalks, curbs, and parking lots are in violation of Title II.  Some of the violations pointed to by the plaintiffs are alleged to deny access to public services; other violations are not similarly tied to the deprivation of access to public services.  In some instances, the alleged violation excludes plaintiffs from public benefits; in other instances, plaintiffs can access the services but only with difficulty.

Given the breadth of the plaintiffs' attack on Arlington's sidewalk, curb, and parking lot system, we must identify with some precision the degree to

---

[4] The ADA was modeled after the Rehabilitation Act, which prohibits recipients of federal funding from discriminating against persons on the basis of their disability. *See* 29 U.S.C. § 794 ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance.").  The ADA expressly provides that the remedies, procedures, and rights available under the Rehabilitation Act also apply to the ADA, and thus jurisprudence interpreting either statute is applicable to both. *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir.), *cert. denied,* 531 U.S. 959 (2000).  Thus, even though the plaintiffs have brought claims under both statutes, for simplicity's sake we refer only to the ADA claim.

[5] A public entity is "any [s]tate or local government" or "any department, agency, special purpose district, or other instrumentality of a [s]tate or [s]tates or local government."  42 U.S.C. § 12131.  A "disability" under the ADA is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1).

[6] For the purpose of clarity, we use the term pre-ADA for sidewalks, curbs, and parking lots that were built prior to the ADA and have not undergone qualifying alterations.

which they are entitled to force compliance with the implementing regulations. In so doing, we move in three steps. First, we briefly review our jurisprudence concerning private causes of action to enforce implementing regulations. Second, we analyze the statutory text. Third, because we conclude that the statutory text is in part ambiguous, we turn to the implementing regulations for guidance.

1.

"[P]rivate rights of action to enforce federal law" are creatures of congressional intent. *Sandoval*, 523 U.S. at 286. The Supreme Court has recognized that Title II's anti-discrimination provision, 42 U.S.C. § 12132, is enforceable through a private right of action. *Barnes v. Gorman*, 536 U.S. 181, 184-85 (2002). When deciding whether a general private right of action recognized under the statutory language carries over to the specifics of the implementing regulations, we ask whether the regulation "effectuates a mandate" of the statute. *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 906-07 (6th Cir. 2004); *see Alexander v. Sandoval*, 532 U.S. 275, 285 (2001) (explaining that only if a regulation "simply appl[ies]" the statutory obligations does a right of action to enforce the statute carry over to implementing regulations). Thus, to the extent that the regulations implement a mandate of Title II, plaintiffs would be able to sue to enforce the regulations.

2.

Before turning to the statute, we briefly explain the manner in which we interpret a statute administered by an executive agency. If, using the traditional tools of statutory construction, we conclude the statute is clear as to the precise question at issue, "we must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). If, however, the statute is ambiguous, we then defer to the agency's interpretation, if it is reasonable. *Id.* Where the agency has promulgated regulations addressing the question, we look first to

those regulations. If the regulations are "ambigu[ous] with respect to the specific question considered," *Moore v. Hannon Food Serv.*, 317 F.3d 489, 495 (5th Cir.2003); *Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (finding *Auer* deference appropriate "only when the language of the regulation is ambiguous"), we defer to the agency's interpretation of its own regulation "unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Belt v. EmCare, Inc.*, 444 F.3d 403 (5th Cir. 2006). Were we automatically to defer to an agency interpretation of an unambiguous regulation, we would in effect "permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." *Christensen*, 529 U.S. at 588. With this in mind, we are prepared to undertake an analysis of Title II.

i.

Title II provides that no individual with a qualifying disability shall, "by reason of such disability, be excluded from participation in or denied the benefits of" state or city provided "services, programs, or activities." 42 U.S.C. § 12132. In *Tennessee v. Lane*, the Supreme Court recognized that this language prohibits not just the discriminatory provision of benefits,[7] but also the failure to take reasonable measures to make these benefits accessible to persons with disabilities. 541 U.S. 509, 531-32 (2004) (citing 42 U.S.C. § 12131(2) and explaining that because "[a] failure to accommodate . . . will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility"). Accordingly, we have stated, in the context of access to public education, that Title II of the ADA "mandat[es] physical accessibility and the

---

[7] Intentional discrimination in the provision of otherwise accessible services, programs, or activities, though also clearly prohibited by Title II, is not at issue in this case and need not be considered.

removal and amelioration of architectural barriers." *Pace v. Bogalusa City School Bd.*, 403 F.3d 272, 291 (5th Cir. 2005).

Later cases have made clear that, at least with respect to the Rehabilitation Act, this obligation extends beyond cases of actual exclusion to cases of constructive exclusion—*i.e.*, a plaintiff need not show it is impossible to access the benefits, but only that, considering all of the circumstances, there is an unreasonable level of difficulty in accessing the benefits. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985) (stating in the context of the Rehabilitation Act that a benefit cannot be offered in a way that "effectively denies" otherwise qualified handicapped individuals "meaningful access" to which they are entitled); *see also Brennan v. Stewart*, 834 F.2d 1248, 1261 (5th Cir. 1988). Other circuits have applied this "meaningful access" standard to ADA claims. *See, e.g., Jones v. City of Monroe, Mich.*, 341 F.3d 474, 479-80 (6th Cir. 2003); *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001). We specifically reserved judgment on this issue in *Melton*, 391 F.3d at 672 n.2, but we now conclude that under the ADA, which was intended to be coextensive with the Rehabilitation Act, a plaintiff must show that a benefit is being administered in a way that "effectively denies" individuals with qualifying disabilities "meaningful access" to the benefits for which they are qualified.[8]

We thus conclude that the statute unambiguously mandates the modification of certain new, altered, and pre-ADA physical infrastructures to the extent they "effectively deny" individuals with disabilities from "meaningful access" to city services, programs, and activities. *Melton*, 391 F.3d at 672 n.2. Thus, to the extent the plaintiffs claim that noncompliance with the regulations

---

[8] "Effective denial" of a benefit is a less demanding requirement for a plaintiff than "exclusion" from a benefit. "Effective denial," however, still requires courts to consider all circumstances, including the degree of hardship on the plaintiff and the reasonableness of the modification given its cost and the availability of substitute services.

9

either outright excludes them from or effectively denies them meaningful access to a service, program, or activity, they have a private cause of action to enforce compliance with the regulations.

Many of the plaintiffs' allegations meet this standard. The plaintiffs allege that certain of the City's physical infrastructure—sidewalks, curbs, and parking lots—hinder them from accessing the City's services, programs, or activities—for example, parks, public schools, and polling stations. The district court on remand will be able to determine precisely which of the plaintiffs' alleged violations are tied to the denial of a service, program, or activity.[9]

In some instances, however, the plaintiffs seek the correction of a noncompliant sidewalk, curb, or parking lot without correlating the violation with a deprivation of a service, program, or activity. In these cases, the plaintiffs argue that a private right of action nevertheless exists because sidewalks, curbs, and parking lots are *themselves* services, programs, or activities, access to which they are deprived via noncompliant curb cuts or poorly maintained walks. This claim presents an issue of first impression in this circuit and we turn to it now.

ii.

The plaintiffs urge that Congress intended Title II to be broad, and they ask us to recognize sidewalks, curbs, and parking lots, not just in their capacity to give access to other services, programs, or activities, but as services themselves.[10] The plaintiffs argue that sidewalks and parking lots are simply

_____

[9] In making this determination, there should be no set proximity limitation of the sidewalk to the benefit; the requested modification need only be reasonable in the light of all the circumstances, including its costs and whether required to ensure the plaintiff meaningful access to a service, program, or activity. Such matters are properly within the sound discretion of the district court.

[10] Other circuits that have considered the issue have, without thorough analysis, interpreted "services, programs, or activities" broadly and have allowed private claims to force cities to update their systems of pedestrian walkways in compliance with Department of

one of the panoply of services provided by the City to its citizens. Thus, they seem to argue, they have a private cause of action under Title II in any instance, at any place in the City, to require the City to modify noncompliant sidewalks or parking lots that are unusable to individuals with disabilities; that is to say, access to other services, programs, or activities is an irrelevant consideration. The City disagrees, arguing that sidewalks and parking lots constitute infrastructure, which may provide access to, but are not themselves, "services, programs, or activities." We agree with the City, and for the reasons that follow, we conclude that sidewalks, curbs, and parking lots are not "services, programs, or activities" within the meaning of Title II.

Title II provides that no individual with a qualifying disability shall "be denied the benefits of the services, programs, or activities of a public entity . . . ." 42 U.S.C. § 12132. "[S]ervices, programs, or activities" is not defined in the statute. We are certain in our own minds, however, that "services, programs, or

---

Justice regulations. For example, the Ninth Circuit reasoned that "services, programs, or activities" can be construed as "anything a public entity does." *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (internal quotations omitted). Because a sidewalk can be characterized as "a normal function of a government entity," public sidewalks fall within the scope of Title II. *Id.* (quotation marks and citation omitted).

The Sixth Circuit has held that "the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does." *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998). On the strength of this interpretation, it has recognized a private right of action to enforce 28 C.F.R. § 35.151, a regulation that establishes accessibility standards for new and altered curbs and sidewalks. *Ability Ctr. of Greater Toledo*, 385 F.3d at 906-07. Under the Supreme Court's holding in *Sandoval*, the Sixth Circuit could only decide in this way by finding that 28 C.F.R. § 35.151 "simply appl[ies]" the obligations of Title II, in other words, by finding that new and altered sidewalks and curbs are a "service, program, or activity."

The Second and Third Circuits have also read "services, programs, or activities" broadly. The Second Circuit has called the language "a catch-all phrase that prohibits all discrimination by a public entity, regardless of context," and has counseled against "hair-splitting arguments" over what falls within its reach. *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997). The Third Circuit has similarly held the language "is intended to apply to anything a public entity does." *Yeskey v. Com. of Pa. Dep't of Corrections*, 118 F.3d 168, 171 (3d Cir. 1997) (quotation marks and citation omitted).

activities" is not "anything a public entity does," as the Ninth Circuit has said in *Barden*, 292 F.3d at 1076; the statute's definition for "qualified individual with a disability" indicates as much. A "qualified individual with a disability" is one who "with or without . . . the removal of . . . *transportation barriers . . .* meets the essential eligibility requirements for the receipt of *services* or the participation in *programs* or *activities* provided by a public entity." 42 U.S.C. § 12131(2) (emphasis added). Thus, we think it is clear that Congress contemplated that some physical infrastructures constitute a different category from the "services" to which they provide access.

Absent a statutory definition or definitive statutory clue, a word "must be given its ordinary, 'everyday meaning.'" *See United States v. Hildenbrand*, 527 F.3d 466, 476 (5th Cir. 2008) (quoting *Watson v. United States*, 552 U.S. 74, 79 (2007)). The definitions for "service"[11] include "[t]he duties, work, or business performed or discharged by a public official," and "the provision, organization, or apparatus for . . . meeting a general demand." MERRIAM-WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2075 (1993). When, for instance, a public entity provides or maintains a sidewalk, or its accompanying curbs, or public parking lots, it arguably creates an "apparatus for . . . meeting a general demand," but it does not perform "work . . . by a public official." Furthermore, the concept of infrastructure is usually inanimate; this suggests that while infrastructure may aid in the provision of other services, it is not considered a service itself.[12]

In short, the statute's "qualified individual with a disability" definition suggests a distinction between certain physical infrastructure on the one hand

---

[11] If sidewalks, curbs, and parking lots fall within the statutory language, we believe it must be as a "service," though the outcome of our analysis would be the same were sidewalks, curbs, and parking lots considered a "program" or "activity."

[12] For example, a bus is a "facility" that provides the service of transportation.

and services, programs, and activities on the other. However, as other circuits have indicated, "services" might be broadly understood to include at least some infrastructures, including sidewalks. Thus, whether sidewalks, curbs, and parking lots are properly considered infrastructure or services is unclear; the statutory language does not rule out the possibility that, for example, some structures used for transportation might be considered to constitute a service. Thus, we cannot conclude that the statutory language *unambiguously* excludes cities' and states' physical infrastructure as distinct from the panoply of less tangible benefits cities and states offer to their residents, even though it is often through and by these infrastructures that the services are delivered.

Because of this ambiguity, we defer to the agency interpretation if it represents a reasonable interpretation of the statutory meaning. We begin with the regulations and turn to other sources only if the regulations are ambiguous. Here, the regulations promulgated by the Department of Justice, which appear at 28 C.F.R. Part 35, are organized into a number of parts. Subpart B contains general requirements. Included therein is a regulation setting forth the general prohibition against discrimination; it essentially repeats the language of Title II's anti-discrimination provision in full, with one minor change.[13] 28 C.F.R. § 35.130. Subpart D deals with the modification of "facilities" to achieve the statutory requirement of accessibility to programs, services, and activities. *Id*. at §§ 35.149-159 ("Subpart D. Program Accessibility"). The first provision in Subpart D sets out a general prohibition forbidding the exclusion of individuals with disabilities from "services, programs, or activities" because "a public entity's facilities are inaccessible to or unusable by individuals with disabilities." *Id*. at § 35.149. By definition, facilities are the public entity's infrastructure—"all or any portion of buildings, structures, sites, complexes, equipment, rolling stock

---

[13] The regulation replaces the language "by reason of such disability" with "on the basis of disability."

or other conveyances, roads, walks, parking lots, or other real or personal property . . . ." *Id.* at § 35.104.

Subsequent provisions of the regulation explain what this requirement of program accessibility means with respect to a public entity's facilities. As to existing facilities, a public entity need not necessarily "make each of its existing facilities accessible." *Id.* at § 35.150. Instead, facilities need to be modified only to the extent that the service, program, or activity at issue is not readily accessible when viewed in its entirety. As to new facilities, or facilities altered in a way that could affect the usability of the facility, the new or altered part must be readily accessible and usable by individuals with disabilities. *Id.* at § 35.151. The regulations go on to mandate the addition of curb ramps at the intersection of newly constructed or altered pedestrian walkways and newly constructed or altered streets, roads, and highways. *Id.* at § 35.151(e).

A few principles can be drawn from the language and regulatory structure which, when considered together, make clear that sidewalks, curbs, and parking lots are not "services, programs, or activities." First, under the regulations, sidewalks, curbs, and parking lots are specifically defined as facilities and are clustered with items that clearly do not qualify as "services, programs, or activities," such as equipment and sites.[14] We can safely assume that this was not a mistake. This alone strongly suggests we read sidewalks, curbs, and parking lots as falling outside the statutory "services, programs, or activities."

Second, unless we consider the regulatory language to be contradictory, facilities cannot merely be a subset of "services, programs, and activities." 28 C.F.R. § 35.149 prohibits "inaccessible and unusable" "facilities" that exclude

---

[14] In its entirety, the definition reads: "Facility means all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located."

individuals with disabilities from "services, programs, or activities." If some facilities were also "services, programs, or activities," then the regulations, in at least some cases, would actually forbid "inaccessible and unusable" "services, programs, or activities" that exclude individuals with disabilities from "services, programs, or activities." We cannot believe that this interpretation is correct. The only sensible reading is that the categories are mutually exclusive and if sidewalks, curbs, and parking lots were intended to be treated as "services, programs, or activities," they would have been left out of the facilities definition altogether.

Third, the implementation of a unique framework of regulatory requirements for facilities, §§ 35.150-151, belies any attempt to equate facilities with "services, programs, or activities." If facilities were themselves "services, programs, or activities," they would be subject to the regulatory language in § 35.149[15] mandating some degree of immediate accessibility. This requirement would render superfluous the facilities regulations in § 35.150-151, which envision a phasing-in of compliant facilities with a focus on achieving general accessibility to other programs, services, or activities, rather than immediate compliance with a focus on making facilities themselves accessible.

Given the explicit identification of sidewalks, curbs, and parking lots as facilities; the relationship between facilities and services, programs, and activities in § 35.149; and the creation of regulations unique to facilities in §§ 35.150-151, the regulations clearly indicate to us that sidewalks, curbs, and parking lots are covered by the statute, not as "services," but in their capacity as gateways to "services, programs, or activities," *i.e.*, as facilities.

---

[15] It reads: "[N]o qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.149.

No. 08-10630

Accordingly, we hold that in the light of the implementing regulations, sidewalks, curbs, and parking lots are not "services, programs, or activities." Because the statute mandates modifications only where an individual with a disability cannot access a service, program, or activity, the regulations requiring modifications to sidewalks, curbs, and parking lots in instances where these facilities do not prevent access to some service, program, or activity do not effectuate a statutory mandate. Plaintiffs thus do not have a private cause of action to enforce the regulatory requirements as they relate to these non-access-denying sidewalks, curbs, and parking lots.

III.[16]

Now we are prepared to consider the issue addressed by the district court—whether the plaintiffs' claims are time-barred. First, we address the plaintiffs' argument that statutes of limitation do not apply to claims seeking only injunctive relief. Second, we identify the proper statute of limitations. Third, we consider when the plaintiffs' claims accrued.

We reject the plaintiffs' assertion that the statute of limitations does not apply to their claims because they seek only injunctive relief. The plaintiffs cite *Voices for Independence v. Pennsylvania Department of Transportation*, 2007 WL 2905887 (W.D. Pa.), a district court opinion that held a statute of limitations did not apply in an ADA case seeking only equitable relief. *Id.* at *16-17. That opinion, in addition to being nonbinding, is also unpersuasive in the light of the fact that courts regularly apply statutes of limitation to claims under Title III

---

[16] Because we hold that there is no private cause of action to challenge sidewalks, curbs, and parking lots unless the noncompliance results in a denial of access to a service, program, or activity, we need not address statute of limitations issues with the claims alleging that sidewalks, curbs, and parking lots are themselves services, programs, or activities. Such claims are not cognizable in a private lawsuit.

No. 08-10630

of the ADA, for which only injunctive relief is available.[17]   *See, e.g., Gaona v. Town & Country Credit*, 324 F.3d 1050, 1054-56 (8th Cir. 2003) (applying Minnesota's six-year statute of limitations to Title III claim for injunctive relief); *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1136 n.2 (9th Cir. 2002) (holding ongoing violation brought Title III claim for injunctive relief within California's one-year limitations period); *Sexton v. Otis Coll. of Art & Design Bd. of Directors*, 129 F.3d 127, 127 (9th Cir. 1997) (applying California's one-year statute of limitations to Title III claim for injunctive relief); *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547 (7th Cir. 1996), *cert. denied*, 519 U.S. 1093 (1997) (applying Illinois's two-year statute of limitations to Title III claim for injunctive relief).  This court has recently held that statutes of limitations apply to § 1983 actions that seek only injunctive relief.  *See Walker v. Epps*, 550 F.3d 407, 414 (5th Cir. 2008).  We decline to treat the plaintiffs' Title II claims differently.

Now, with respect to the application of the correct limitations period, we begin by noting that neither Title II of the ADA nor the Rehabilitation Act provides a limitations period, and the general federal statute of limitations does not apply to either statute.[18]  We have previously held, however, that the Texas two-year statute of limitations for personal injury claims applies in Title II cases filed in Texas federal courts.  *Holmes v. Texas A&M Univ.*, 145 F.3d 681, 683-84

---

[17] Remedies available under Title III of the ADA are the same as those under Title II of the Civil Rights Acts of 1964, 42 U.S.C. § 2000, for which there is only injunctive relief.  42 U.S.C. § 12188(a); *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968) (Title II of the Civil Rights Acts of 1964 provides injunctive relief only).

[18] Title II adopts the remedies, procedures, and rights of the Rehabilitation Act.  42 U.S.C. § 12133.  The limitations period in Rehabilitation Act cases is governed by 42 U.S.C. § 1988(a).  That statute directs courts to apply federal law if it provides a limitations period or, if it does not, apply common law, as modified by state law, if it is not inconsistent with the Constitution or laws of the United States.  *See, e.g., Holmes v. Texas A&M Univ.*, 145 F.3d 681, 683-84 (5th Cir. 1998) (citing *Hickey v. Irving Indep. Sch. Dist.*, 976 F.2d 980, 982 (5th Cir. 1992)).  For Title II claims courts borrow the state statute of limitations from the most analogous state law claim.

(5th Cir. 1998); TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (Vernon Supp. 2007). The district court thus applied the correct two-year statute of limitations.

The Supreme Court has been clear that a claim accrues when the plaintiff knew or should have known that the discriminatory act occurred. *See Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) ("the proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful" (citing *Del. St. Coll. v. Ricks*, 449 U.S. 250, 258 (1980)). Here, the discriminatory act is the denial of access to the service, program, or activity. A plaintiff thus has two years, from the time she knew or should have known that she was denied access to a service, program, or activity, to challenge the architectural barriers causing the exclusion. This is a fact question that must be determined by the fact-finder.

Because the plaintiffs failed to plead that their injuries occurred within two years of the filing of their complaint, the district court dismissed their action. However, as always, the defendant has the burden of establishing affirmative defenses, including a statute of limitations, and so it is the City's obligation to demonstrate expiration of the limitations period. FED. R. CIV. P. 8 ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . statute of limitations[.]"); *see also In re Hinsley*, 201 F.3d 638, 644-45 (5th Cir. 2000) (Under Texas law, "[a] party asserting limitations must establish the applicability of the limitations statute, but must, as well, prove when the opponent's cause of action accrued[.]"(quoting *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex. App. 1984, writ refused n.r.e.)). In this respect the district court erred.

In summary: Plaintiffs' claims are subject to a two-year statute of limitations; plaintiffs' claims accrue when they knew or should have known that they are denied access to a service, program, or activity; and the burden is on the

defendant to prove its affirmative defense that the statute of limitations has expired.

## IV.

We recap the holdings of this opinion: Title II mandates that cities take reasonable steps to modify infrastructure that "effectively denies" individuals with disabilities access to programs, services, and activities. We hold that curbs, sidewalks, and parking lots do not constitute a service, program, or activity within the meaning of Title II of the ADA. Accordingly, plaintiffs have established cognizable claims under Title II only to the extent they have alleged a noncompliant sidewalk, curb, or parking lot denies them access to a program, service, or activity that does fall within the meaning of Title II. As to their claims that meet this standard, the district court correctly held the plaintiffs' claims were subject to a two-year statute of limitations. These claims accrued on the date the plaintiffs knew or should have known they were denied access to a program, service, or activity on account of the noncompliant facility. However, the district court improperly burdened the plaintiffs with proving accrual within the two years preceding the filing of their complaint. We therefore VACATE the district court's judgment of dismissal and REMAND for such further proceedings not inconsistent with this opinion.

VACATED and REMANDED.

No. 08-10630

PRADO, Circuit Judge, concurring in part and dissenting in part:

Although my colleagues granted rehearing and now hold that the statute of limitations applicable to the plaintiffs' claims here begins to run when the individual plaintiff was denied a service, program, or activity,[1] the majority has performed an about-face, and now also holds that sidewalks, curbs, and parking lots[2] are not services under the ADA. While I agree that we must remand this case, I cannot agree with the majority's novel approach to coverage under the ADA, and once again I must dissent.[3] I believe that characterizing sidewalks as "facilities," and thereby limiting private causes of action under the ADA, is not supported by the statute, regulations, or caselaw. I fear that the majority departs dramatically from congressional intent and creates a distinction that is unworkable and ultimately meaningless.

I.

The majority asks whether sidewalks "are services themselves." Maj. Op. at 10. This is not the correct inquiry. The question is not whether the physical structures that compose the sidewalks are a service; rather, it is whether a city provides a service through the construction, maintenance, or alteration of those sidewalks. The answer, of course, is yes. *See Barden v. City of Sacramento*, 292 F.3d 1073, 1074, 1076 (9th Cir. 2002) ("We must decide whether public sidewalks . . . are a service, program, or activity . . . within the meaning of [the ADA]. We hold that they are . . . . [because] maintaining public sidewalks is a normal function of a city . . . ."). A public entity that constructs a sidewalk

---

[1] For simplicity, I refer to "services, programs, and activities" simply as "services."

[2] Similarly, for simplicity, I refer to "sidewalks, curbs, and parking lots" as "sidewalks."

[3] Because the majority now recognizes that "[a] plaintiff . . . has two years, from the time she knew or should have known that she was denied access to a service, program or activity, to challenge the architectural barriers causing the exclusion," I concur in Part III of the majority's opinion. Maj. Op. at 18.

performs a public service. Asking whether sidewalks themselves are a service engages in the type of "hair-splitting" cautioned against by our sister circuits. *See Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 44–45 (2d Cir. 1997) (holding that the zoning decisions of a public entity are covered by the ADA "because making such decisions is a normal function of a government entity"). The majority's approach does not comport with the plain, unambiguous text of the ADA; thus we need not look to the regulations or congressional intent. Even if we do, however, the majority's approach is not supported by the promulgated regulations and does not satisfy the intent of Congress.

A.

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In our original opinion, we reasoned:

> Among the definitions for "service" is "a facility supplying some public demand." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1137 (11th ed. 2003). When, for instance, a public entity provides a sidewalk, or its accompanying curbs, or public parking lots, it provides "a facility supplying some public demand." Because providing curbs, sidewalks, and parking lots is a service within the ordinary, "everyday meaning" of that word, we hold that those facilities also constitute a "service" within the meaning of Title II.

*Frame v. City of Arlington*, 575 F.3d 432, 437 (5th Cir. 2009). I continue to agree with this reasoning. The majority's new opinion, however, adopts a new definition to arrive at a very different result:

> The definitions for "service" include "[t]he duties, work, or business performed or discharged by a public official," and "the provision,

21

> organization, or apparatus for . . . meeting a general demand."
> MERRIAM-WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2075
> (1993). When, for instance, a public entity provides or maintains
> a sidewalk, or its accompanying curbs, or public parking lots, it
> arguably creates an "apparatus for . . . meeting a general demand,"
> but it does not perform "work . . . by a public official."

Maj. Op. at 12. I do not think that two definitions from dueling *Merriam-Webster's* dictionaries justify changing our approach to this case. Indeed, *either* definition encompasses a broad reading of services. When a public entity constructs, maintains, or alters a sidewalk, it performs the "work" traditionally undertaken by a municipality, and thereby provides a public service.

In a show of impressive solidarity, our sister circuits have consistently held that coverage under "services, programs, and activities" is unambiguous and should be broadly construed.[4] The majority's opinion dismisses the work of our sister circuits in a footnote, disregarding their interpretation of the ADA and asserting that they considered the issue "without thorough analysis." Maj. Op. at 10 n.10. On the contrary, I believe that the Ninth Circuit, in *Barden*,

---

[4] *Barden*, 292 F.3d at 1076 ("Rather than determining whether each function of a city can be characterized as a service, program, or activity for purposes of Title II, however, we have construed the ADA's broad language [as] bring[ing] within its scope anything a public entity does.") (quotations and citations omitted); *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) ("[W]e must acknowledge that our conclusion—that the discrimination forbidden by § 12132 must be with regard to services, programs, or activities—is for the most part a distinction without a difference. This is because we find that the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does."); *Yeskey v. Comm. of Pa. Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir. 1997) ("The statutory definition of '[p]rogram or activity' in Section 504 indicates that the terms were intended to be all-encompassing. They include '*all* of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . any part of which is extended Federal financial assistance.") (quoting 29 U.S.C. § 794(b)) (emphasis added); *Innovative Health Sys.*, 117 F.3d at 44 ("The ADA does not explicitly define 'services, programs, or activities.' Section 508 of the Rehabilitation Act, however, defines 'program or activity' as 'all of the operations' of specific entities . . . .'") (quoting 29 U.S.C. § 794(b)(1)(A)), *superseded on other grounds*, *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001).

No. 08-10630

thoroughly considered the text of the statute, regulations, and legislative history of the ADA provisions at issue here.

The Ninth Circuit answered the same question presented in this case,[5] and held that "*maintaining* public sidewalks is a normal function of a city and without a doubt something that the [city] does. Maintaining their accessibility for individuals with disabilities therefore falls within the scope of Title II." *Id.* at 1076 (emphasis added) (citation and internal quotations omitted). Contrary to the approach taken by the majority opinion, the Ninth Circuit focused its inquiry "not . . . on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is 'a normal function of a governmental entity.'" *Id.* (quoting *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731 (9th Cir. 1999)). We relied on *Barden* in the previous opinion, *see Frame*, 575 F.3d at 436–37, and I am convinced that this reliance was well-placed.

The majority states that it "cannot conclude that the statutory language *unambiguously* excludes cities' and states' physical infrastructure as distinct from the panoply of less tangible benefits cities and state offer to their residents." Maj. Op. at 13. However, I interpret the language of the statute as providing broad coverage, encompassing both the intangible services offered by public entities and the act of offering tangible goods. A statute is not ambiguous simply because it offers expansive coverage.

B.

The statute is unambiguous. Thus, we need not turn to the Department of Justice's regulations. Assuming that we should, however, a plain-reading of

---

[5] "We must decide whether public sidewalks in the City of Sacramento are a service, program, or activity of the City within the meaning of Title II of the [ADA] or [the Rehabilitation Act]." *Barden*, 290 F.3d at 1074.

23

the regulations demonstrates that providing sidewalks is a public service.  In the preamble to its regulations, the Department of Justice explains:

> The scope of title II's coverage of public entities is comparable to the coverage of Federal Executive agencies under the 1978 amendment to section 504, which extended section 504's application to all programs and activities 'conducted by' Federal Executive agencies, in that title II applies to *anything a public entity does*.

28 C.F.R. pt. 35, app. A at 456 (1996) (emphasis added).

The majority's opinion looks to Subpart D of the regulations to define "facilities."  Maj. Op. at 13 (citing 28 C.F.R. § 35.1149–59).  The opinion then reasons that because physical structures such as sidewalks are defined as facilities and "clustered with items that clearly do not qualify as 'services, programs, or activities,'" they cannot be considered services.  Maj. Op. at 14. The majority concludes that because only the regulations which apply to services are actionable, a private cause of action exists only for the sidewalks which facilitate a service.

Although the regulations may set apart facilities from services, nothing in the regulations suggests that when a public entity *provides* those facilities, it does not provide a service.  Indeed, when a municipality constructs a new facility, or alters an existing one, it must comply with the ADA.  *See* 28 C.F.R. § 35.151(a) & (b).  Curb ramps and sidewalks are specifically mentioned in 28 C.F.R. § 35.151(e)(2), which requires that "[n]ewly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways."  When a public entity is charged with providing new or altered facilities in compliance with the ADA, the regulations do not require that those facilities relate to a covered service.

No. 08-10630

Similarly, there is no limitation that a sidewalk must take the traveler to a "service."[6]

Again, I think that the majority opinion's approach asks the wrong question. It is not the sidewalks themselves that we should concern ourselves with; it is the construction, modification, or alteration of sidewalks that is the "service." The failure of the public entity to construct, alter, or maintain sidewalks in compliance with the ADA is actionable within the scope of the regulations.

C.

Although I do not believe it is necessary to look to the legislative history, Congressional adoption materials support a broad reading of the ADA. In the accompanying House Report, Congress stated that Title II "simply extends the anti-discrimination prohibition embodied in section 504 [of the Rehabilitation Act] to *all actions of state and local governments*." H.R. Rep. No. 101-485(II), at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367 (emphasis added); *see also id.* at 151, *reprinted in* 1990 U.S.C.C.A.N. 303, 434 ("Title II . . . makes *all activities* of State and local governments subject to the types of prohibitions against discrimination . . . included in section 504 . . . .") (emphasis added). When a public entity acts, its actions necessarily fall within the coverage of the ADA and section 504 of the Rehabilitation Act.

"[T]he elimination of architectural barriers was one of the central aims of the Rehabilitation Act." *Alexander v. Choate*, 469 U.S. 287, 297 (1985) (citing

---

[6] Although it is merely illustrative of the scope of the regulations and not of a private right of action, under 28 C.F.R. § 35.150(d)(2), public entities are required to develop a transition plan for ADA compliance, including a "schedule for providing curb ramps or other sloped areas where pedestrian walks cross curbs, giving priority to walkways serving entities covered by the Act . . . followed by walkways serving other areas." Sidewalks serving public entities are given priority, but the Department of Justice saw fit to include all manner of destinations within the "other areas" catchall. That the regulation has such broad scope seems to run contrary to the majority's requirement that a sidewalk must lead to a "service."

No. 08-10630

S. Rep. No. 93-318, p.4 (1973), U.S. Code Cong. & Admin. News 1973, pp. 2076, 2080)).    And, as this Circuit has elaborated, the purpose of the ADA and section 504 "is the elimination of discrimination against individuals with disabilities . . . [by] [m]andating physical accessibility and the removal and amelioration of architectural barriers." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 291 (5th Cir. 2005) (en banc).    It would be contrary to the purpose of the ADA for a public entity to erect non-compliant sidewalks.

There exists further indication that Congress did not intend for courts to draw the type of distinction offered in the majority's opinion.[7]   Congress was particularly clear on the subject of curb cuts—a portion of the plaintiffs' claims here—stating that: "[t]he employment, transportation, and public accommodation sections of this Act would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between the streets." H. Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 367.    Therefore, "under this title, local and state governments are required to provide curb cuts on public streets." *Id.*

Nowhere in the legislative history do the architects of the ADA suggest that the ADA does not cover a public entity's actions with regard to its sidewalks.  If anything, the clear indications that Congress intended the ADA

---

[7] As explained by one of the ADA's proponents:

Title II covers the range of services, programs and benefits offered by State and local governments, without a requirement that such programs or activities received Federal financial assistance.  Thus, *title II extends to whatever spheres of authority a State or local government is involved in*—including employment, health and service programs, *the streets—which require curb-cuts*—and the facilities owned or operated by such governments.

136 CONG. REC. E1913-01, E1916 (daily ed. May 22, 1990) (statement of Rep. Hoyer) (emphasis added).  Nothing in the above quote indicates that "the streets" should be treated differently than employment or heath and service programs.

to encourage (and sometimes mandate) the evenhanded offering of public services, should caution against the majority's opinion's distinctions.

## II.

In addition to the statutory analysis performed in Part I, I am concerned by the broader implications of the majority's approach; namely, there is no precedent to support the majority's distinction and the new standard is unworkable.

## A.

The majority's opinion offers no caselaw to support its new analysis. Considering the potential implications of the majority's novel approach, and given the clear intent of Congress described above, this dearth of precedent is troubling.[8]

Additionally, I am unable to locate a single circuit court case that could support the majority's opinion even by analogy or extrapolation. *Kinney v. Yerusalim*, from the Third Circuit, provides some analogous support for a distinction between the treatment of existing facilities and new constructions and alterations. *See* 9 F.3d 1067, 1072 (3d Cir. 1993) (finding that street resurfacing is an "alteration" under 28 C.F.R. § 35.151(b), and thereby requiring curb cuts under 28 C.F.R. § 35.151(e)). Although the regulations place different burdens on municipalities with regard to existing facilities and new or altered facilities, *compare* 28 U.S.C. § 35.150(a) & (b), *with id.* § 35.151(b), even *Kinney*

---

[8] My research reveals only a single federal case that supports the majority's new analysis. In *New Jersey Protection and Advocacy, Inc. v. Township of Riverside*, No. 04-5914, 2006 WL 2226332, at *3 (D.N.J. Aug. 2, 2006), a district court held that sidewalks were not "in and of themselves, programs, services, or activities for the purpose of the ADA's implementing regulations." Obviously, an unpublished district court case from another circuit does not control our analysis. Nor does the district court's opinion alter my belief that we should look to the act of providing, maintaining, and altering the sidewalk as the covered service.

No. 08-10630

supports a broad reading of covered services and cannot be extended to assist the majority's approach.[9]

The majority's opinion creates a split with the Ninth Circuit and is unsupported by any of our sister circuits. While the absence of caselaw on point or analogous treatment is not dispositive, the *Barden* opinion and the great weight of caselaw supporting a broad reading of the ADA, *supra* note 4, forces me to doubt the validity of the majority's new analysis.

B.

The majority's opinion draws a distinction between tangible facilities and intangible services. This distinction will not work when applied to the numerous mixed tangible/intangible services rendered by public entities. Take, for example, a public park. The park has intangible aspects: entertainment, respite, and fresh air. But it also has tangible aspects: the pathways, drinking fountains, and green spaces. Can we separate the tangible aspects from the intangible? Or are the tangible aspects of a park so interwoven with the intangible that any attempt at separation is futile? When applied to this park hypothetical, I think that the merits of our original treatment of the scope of

---

[9] *Kinney* considered whether the resurfacing of city streets constituted an "alteration" under the regulations. 9 F.3d at 1069. At no point did the Third Circuit draw a distinction between streets and the service of providing them:

> If a street is to be altered to make it more usable for the general public, it must also be made more usable for those with ambulatory disabilities. At the time that the City determines that funds will be expended to alter the street, the City is also required to modify the curbs so that they are no longer a barrier to the usability of the streets by the disabled.

*Id.* A street is also named as a "facility." *See* 8 C.F.R. § 35.104. And, obviously, a street is merely a physical structure akin to the sidewalks at issue here. Yet nowhere in *Kinney* did the Third Circuit imply that the street must lead an individual to a public service or be used by buses for public transport. It is enough that the public entity has decided to alter the street to bring the alteration within the ambit of ADA compliance.

28

services are readily apparent. When a public entity decides to build a park (or later alter it), it must do so in a way that provides equal opportunities for access to disabled people.

The majority goes to some lengths to claim that "there should be no proximity limitation of the sidewalk to the benefit." Maj. Op. at 10 n.9. The majority's attempt to water-down its own new standard illustrates the difficulty of managing and applying this new standard. In essence, a sidewalk falls outside of the majority's standard only if it is a sidewalk to nowhere. I question, however, whether any sidewalk goes nowhere.

If the noncompliant sidewalk is immediately outside of a disabled person's home, that sidewalk will necessarily deny the individual access to any public services. If a disabled individual wants to take a circuitous path to a library and encounters a noncompliant sidewalk, may that disabled person properly bring a claim? Under the "sidewalks to nowhere" standard, must a disabled person use the most direct path to a public service? If a disabled person may avoid a sidewalk lacking a curb cut by taking an easy detour, must she do so? Each of these questions runs counter to the basic ameliorative and equalizing aspects of the ADA. *See Pace*, 403 F.3d at 291 ("[T]he Congressional objective of both the ADA and § 504 is the elimination of discrimination against individuals with disabilities. . . . Mandating physical accessibility and the removal and amelioration of architectural barriers is an important purpose of each statute.").

The district court, on remand, will be placed in the unenviable position of attempting to apply this standard. The district court will be forced to wrestle with a standard lacking any clear limitations or answers to the questions I have posited above. The majority reasons away these fundamental issues with its statement that proximity should not be considered. But if proximity is of no

consequence, then what sidewalk could ever fall outside of the reach of the majority's novel standard?

*\*\**

Arlington built sidewalks. Arlington maintains sidewalks. And, when it deems it appropriate, Arlington alters the sidewalks. Each of these acts is a normal function of government. The acts taken by Arlington with regard to its sidewalks fall within the unambiguous meaning of "services, programs, and activities." I respectfully dissent.